J-S38045-22

2023 PA Super 15

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JASON ANDREW LEAR :
:
Appellant : No. 700 EDA 2022

Appeal from the Judgment of Sentence Entered February 16, 2022,
in the Court of Common Pleas of Montgomery County,
Criminal Division at No(s):  CP-46-CR-0002239-2020.

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JASON ANDREW LEAR :
:
Appellant : No. 701 EDA 2022

Appeal from the Judgment of Sentence Entered February 16, 2022,
in the Court of Common Pleas of Montgomery County,
Criminal Division at No(s):  CP-46-CR-0002816-2020.

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JASON ANDREW LEAR :
:
Appellant : No. 702 EDA 2022

Appeal from the Judgment of Sentence Entered February 16, 2022,
in the Court of Common Pleas of Montgomery County,

Criminal Division at No(s):  CP-46-CR-0003882-2020.

BEFORE:  KUNSELMAN, J., MURRAY, J., and SULLIVAN, J.

OPINION BY KUNSELMAN, J.:                    **FILED FEBRUARY 1, 2023**

Jason Andrew Lear appeals the judgment of sentence following his non-jury trial and conviction for aggravated assault and theft offenses.  He challenges the denial of his motion to suppress evidence and his motion to dismiss under Pennsylvania Rule of Criminal Procedure 600.  We affirm the denial of suppression, but we remand for a hearing for the trial court to determine whether the Commonwealth exercised due diligence.

These consolidated cases involve a series of criminal incidents, including a series of thefts of snowplow equipment beginning in October 2019.  On January 11, 2020, while fleeing from Lower Moreland police, Lear threw his bicycle, breaking the ribs of Officer Christopher Daniel.  On January 13, 2020, Lear was involved in a traffic stop.  The trial court made the following factual findings about the stop:

> Officer Daniel Leporace of the Warminster Township Police Department conducted a traffic stop of "a silver Chevrolet sedan with Virginia registration" after a review of the registration "showed that the registration was expired and it belonged to a rental agency."  The operator (later determined to be Defendant, *Jason* Lear) and passenger of the vehicle identified themselves as *Craig* Lear and Corrine Dietrich, respectively, and provided birth dates.  Officer Leporace noted that "[t]hey both appeared to be experiencing an extreme level of nervousness.  There were some items in the rear passenger floor that when I questioned about it, it appeared they became even more nervous."  Officer Leporace testified that, in his experience, this extreme nervousness occurred "not often" and this type of reaction raised his suspicion of "criminal activity" occurring.  Both of the individuals in the

- 2 -

vehicle stated they were returning from Parx Casino to the operator's grandmother's home, but did not have any form of identification on them.

After obtaining a verbal identification from both the driver and passenger, Officer Leporace ran their information. Officer Leporace explained that "Ms. Dietrich had a warrant out for … disorderly conduct. … Due to Mr. Lear – well, both of them acting a certain way, I pulled up JNET on my mobile data terminal and I ran the information that he provided which did show a picture of Mr. Lear." He further noted that "Mr. Lear had two I.D.s with both his brother's name and his name with his photograph in the PennDOT system. So someone used his brother's name and his name with his photograph in the PennDOT system." Officer Leporace also learned that "Jason Lear […] had a suspended driver's license at the time." The officer decided to attempt "to establish identity for the purposes of issuing a citation or warning or whatever it may be."

After asking the passenger to exit the vehicle, "[s]he was hesitant. … She was reaching into her pocket and she look[ed] like she was trying to remove something from the pocket, but also keep it concealed from" Officer Leporace, who could not determine what it was. Officer Leporace then noticed that "she had a wallet, which is similar to what male subjects would carry" that he could see in plain view of her sweatshirt, "[b]ut she did not want to remove that wallet from her hoodie pocket." The passenger refused to hand over the wallet and [Lear] "was saying something to the effect that it was his brother's wallet" and that the Officer could not see it. This made Officer Leporace believe "some type of criminal activity [was] afoot."

The passenger then gave the wallet to [Lear] "[a]nd he was questioned about it. And then he was opening the wallet and started removing some credit cards from it. And he was holding it out to show [the officer] but it was also covering the face of the identification." When [Lear] held the wallet out of the window, Officer Leporace pulled the wallet towards himself, and took possession of the wallet, to get a better look at the identification which he later confirmed was [Lear].

*     *     *

A video entered into evidence[1] corroborated Officer Leporace's testimony and demonstrated the following:

- The passenger stated she had no identification. After she was asked to exit the vehicle, the passenger removed a number of items from her pockets, including what both officers identified as a wallet that would typically belong to a male.

- It is clear from the video that the passenger, in removing the items from her pocket, attempted to conceal the wallet. The passenger initially refused to answer several requests from both officers concerning whose wallet she possessed. She clearly attempted to feign confusion and acted as if she had emptied her pockets without removing the wallet.

- It was not until she was asked to specifically remove the wallet numerous times, and after she removed all other items, that she took the wallet out of her pocket.

- During the discussion regarding the wallet, [Lear] attempted to exit the vehicle despite being told to remain in the vehicle.

- The passenger initially denied knowing whose wallet it was, claiming to have seen it lying on the console. She later said she "thinks" it belonged to [Lear's] brother.

- The officers asked the passenger if they could look through the wallet; she refused. [Lear] then claimed the wallet, indeed, belonged to [his] brother.

- The police articulated their suspicion that the passenger was in possession of a stolen wallet. Both [Lear] and the passenger vehemently denied the wallet was stolen but neither would permit the officer to open it.

- The police informed [Lear] and the passenger that the matter could be resolved if they produced the wallet to confirm it contained the identification of [Lear's] brother. [Lear] and the passenger refused. The passenger was asked to identify the first name of [Lear's] brother and she would not do so.

- The passenger offered to hand the wallet to [Lear] so [Lear] could decide whether to provide it to police. The police permitted her to do so. [Lear] proceeded to pull out multiple

_____

[1] This video was not included in the certified record on appeal.

cards, purportedly to show the police, but was only showing portions of each card by covering a majority of each with his hand.

- [Lear] agreed to pull out various cards (which he obstructed with his hands) but refused to pull out the ID to verify the identity of the wallet's owner. As [Lear] attempted to conceal the photo on the ID, both officers clearly state to [Lear] they believe the picture in the wallet is him. [Lear] held up the wallet outside of the window so that it was physically outside of the car itself. At this point, Officer Leporace clasped his hand on the wallet and pulled it out of [Lear's] hand and towards his person.

Trial Court Opinion, 4/15/22, at 3–4, 21–22 (record citations omitted); *see also* N.T., 11/1/21, at 113–120 (announcing findings of fact on the record). The wallet contained identification for both Lear and his brother. Officer Leporace declined to issue a citation or to detain Lear any further.

A police task force identified Lear as the perpetrator of the thefts and the bicycle-throwing incident. Police prepared criminal complaints against Lear, which were filed on May 19, June 8, and July 17, 2020. The trial court described the events surrounding Lear's arrest:

On the morning of May 2[1], 2020, the U.S. Marshals Service Violent Crime Task Force and local police, consisting of approximately "ten to twelve maybe at the most" law-enforcement officials, arrived at the confirmed address of [Lear] to execute the arrest warrant related to the aggravated assault of Officer Daniel. The U.S. Marshals arrived "carry[ing] ballistic equipment," including "level four vests, level 3A shields, rifles, sidearms, entry equipment to include a RAM, a halligan, as well as safety equipment" and were wearing "tactical uniforms." After attempting to flee from officers, [Lear] was ultimately placed under arrest.

A search incident to arrest of [Lear] revealed he was in possession of "U.S. currency" and "other smaller effects in his pocket." U.S. Marshal Robert Clark testified that after "ask[ing]

him what he wanted done with the money," [Lear] instructed U.S. Marshal Clark to "take it to [his] grandmother who's inside the house." Id. at 43.

Acting on [Lear's] express instruction, Marshal Clark "knocked on the screen door but the inner door, the entry door to the property, was ajar or opened. [He] did knock and announced [his] presence." No one inside the home answered his knock. Marshal Clark "then entered the property and … returned the money to [Lear's] grandmother who was on the living room sofa." The living room was "immediately to the left" after entering the residence. When Marshal Clark entered through the front door, he noticed in the foyer "a plethora of items stacked up very nice and neat," including "a dirt bike, … tools, [and] some other machinery equipment." He did not have to move anything or search through any items in the home to find the bike and tools.

Trial Court Opinion, 4/15/22, at 27–28 (record citations omitted); *see also* N.T., 11/1/21, at 121–123. Based in part on Marshal Clark's observations, police obtained and executed a search warrant for Lear's house.

On March 31, 2021, Lear filed an omnibus pre-trial motion, including a motion to suppress evidence. The trial court scheduled a pre-trial "triage conference" for August 10, 2021. At the conference, the case was scheduled for a 3-day bench trial in November, later ordered to start November 1, 2021.

On October 21, 2021, Lear filed a motion to dismiss his case per Rule 600(D)(1). The Commonwealth filed an answer the same day. Lear filed a supplemental motion to dismiss on November 1, 2021.

Before trial on November 1, 2021, the trial court heard argument on Lear's Rule 600 motion without taking evidence. Lear and the Commonwealth incorporated their written motions into argument.[2] The trial court found "that

_____

[2] The trial court indicated that the issues included therein were preserved.

- 6 -

the delay in trying this case is a direct result of the judicial emergency and in accordance with Judge DelRicci's order as the President Judge." N.T., 11/1/21, at 8. Accordingly, it denied Lear's motion. The trial court then held a suppression hearing and denied Lear's motion to suppress.

Lear's cases proceeded to a three-day bench trial, after which the trial court found Lear guilty of aggravated assault, theft by unlawful taking, and related offenses. On February 16, 2022, the court sentenced Lear to an aggregate term of 5 to 12 years of imprisonment. Lear filed a post-sentence motion, which the court denied. Lear timely appealed. Lear and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Lear raises three issues for review:

I.  Did the lower court err in denying [Lear's] motion to suppress the fruits of the January 13, 2020 car stop of [Lear], and the fruits of a subsequent search warrant including information obtained during the stop, where no reasonable suspicion existed to extend the car stop once the initial mission of investigating a traffic violation had been completed?

II. Did the lower court err in denying defendant's motion to [] suppress the fruits of US Marshal Robert Clark's entry into [Lear's] residence, including Clark's observations and the fruits of the subsequent search warrant based on those observations, where Clark did not have the explicit, unequivocal, specific, and voluntary consent of [Lear] to enter the property without a warrant?

III. Did the lower court err in denying [Lear's] motion to dismiss pursuant to Pa.R.Crim.P. 600?

Lear's Brief at 3 (reordered for ease of disposition).

**I.     The trial court properly denied Lear's suppression motions based on reasonable suspicion to prolong a traffic stop and Lear's consent to enter his house.**

Lear challenges the trial court's denial of his motion to suppress the evidence from the traffic stop and his house.   He contends that Officer Leporace unconstitutionally prolonged the traffic stop beyond the time needed to issue a citation.   Lear's Brief at 45–48 (relying on ***Commonwealth v. Malloy***, 257 A.3d 142 (Pa. Super. 2021), which found no reasonable suspicion to ask a stopped motorist about his authority to carry a firearm).   He argues that his statements to Marshal Clark did not provide consent to enter his house.  ***Id.*** at 40–44.   He concludes that if this evidence was suppressed, the ensuing search warrants would lack probable cause due to staleness.

On appeal from the denial of a motion to suppress evidence, our review

is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.  We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted.  Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

***Commonwealth v. McMahon***, 280 A.3d 1069, 1071 (Pa. Super. 2022) (quoting ***Commonwealth v. Yandamuri***, 159 A.3d 503, 516 (Pa. 2017)).

The trial court analyzed Lear's traffic stop claim as follows:

During a lawful traffic stop, "police may require the driver of a lawfully stopped vehicle to exit the vehicle without any additional probable cause or reasonable suspicion without

- 8 -

violating an individual's Fourth Amendment rights." Even if a traffic stop is lawful, transforming the stop into "[a]n investigatory stop, which subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute an arrest, requires a reasonable suspicion that criminal activity is afoot." ***Commonwealth v. Fuller***, 940 A.2d 476[, 479] (Pa. Super. 2007) (citing ***Terry v. Ohio***, 392 U.S. 1[, 21] (1968)). To determine if an officer had reasonable suspicion, the totality of the circumstances must be considered. The Supreme Court has explained that

> [i]n making this determination, we must give "due weight … to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience." Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, "even a combination of innocent facts, when taken together, may warrant further investigation by the police officer."

***Commonwealth v. Rogers***, 849 A.2d 1185, 1189 (Pa. 2004).

\*   \*   \*

Shortly after the initial traffic stop, it was clear to [the trial court] that Officer Leporace had reasonable suspicion that there was criminal activity afoot. Officer Leporace did not violate either the passenger or [Lear's] constitutional rights by asking them out of the vehicle. It is notable that both the passenger and [Lear] stated that they just left the casino but did not have identification on them. [Lear] both appeared to be unusually nervous and gave evasive and confused responses to simple questions. The officer credibly testified that the interactions between the passenger, [Lear], and both officers made him believe they could have stolen the wallet from the Parx Casino. Officer Leporace had enough reasonable suspicion to justify transforming the initial encounter into an investigative detention.

During the questioning, [Lear] and [the] passenger continued to maintain the wallet did not belong to them. [Lear] ultimately consented to the police viewing the wallet while it was in [his] hands. However, in doing so, [Lear] continued to obstruct the officer's view by keeping his thumb over portions of the card.

Ultimately, after some back-and-forth, [Lear] held the wallet outside the open window of the vehicle immediately in front

- 9 -

of the officer. Officer Leporace clasped the wallet and pulled it towards him. Significantly, Officer Leporace did not reach into the vehicle to take possession of the wallet and made no contact with [Lear] in doing so. Nor did he grab the wallet in an aggressive manner.

[The trial court] acknowledges that on cross, Officer Leporace agreed it was fair to conclude that he assumed possession of the wallet "forcefully." However this testimony must be considered in context. The video confirms that Officer Leporace used no violent or sudden movements in clasping his hand on the wallet and obtaining possession. The officer only did so after [Lear] extended it and put it outside the window. Certainly, [Lear] did not "hand it over on a silver platter," but the officer took control of the wallet after it was extended toward him.

Importantly, in evaluating the totality of the circumstances [at the time of the search, Lear] never claimed a legitimate possessory interest in the wallet. To the contrary, he asserted at all times that the wallet did not belong to him. Indeed, both the passenger (who initially possessed the wallet) and [Lear] denied ownership. The police officer appropriately questioned whether [Lear] and the passenger were being honest about the wallet and acted within his constitutional authority in assuming control of the wallet when it was extended, outside the window, toward him.

The Superior Court analyzed an analogous case in **Commonwealth v. Moore**, 446 A.2d 960 (Pa. Super. 1982). In **Moore**, the police saw the appellant and another man in a high crime area "leafing through something" in the appellant's hand. **Id.** at 961. The appellant ran upon seeing the police car. The police officer followed the appellant who, after being told "several times" to stop, finally did so. The officer noted, while chasing the appellant, "that the object in the appellant's hand was a wallet." When the appellant stopped, "the officer approached him, frisked him, and took the wallet from his hand." **Id.**

[In affirming the denial of the Moore's motion to suppress the seizure of the wallet,] the Superior Court reasoned that based on his observations of the appellant, the officer had "reasonable caution to suspect criminal activity was afoot." This "justified the brief investigatory stop[,"] and "[t]he subsequent seizure and examination of the wallet was within the permissible scope of the investigatory stop, especially because the officer had seen the

- 10 -

appellant leaf through it with his companion, then clutch it throughout the chase." *Id.* at 962.

Instantly, like in *Moore*, the police developed reasonable suspicion to believe that criminal activity was afoot. Acting on that reasonable suspicion, the police conducted a "brief investigatory stop" and became justifiably concerned that the wallet at issue may be evidence of a crime. The officer subsequently seized the wallet and examined its contents. Like with *Moore*, this seizure and examination, given the totality of the circumstances, "was within the permissible scope of the investigatory stop." *Id.*

Trial Court Opinion, 4/15/22, at 20–25 (record citations and some legal citations omitted).

The trial court analyzed Lear's house claim as follows:

The Fourth Amendment to the Constitution of the United States provides that "searches and seizures without a warrant are presumptively unreasonable, subject only to specifically established exceptions. *Commonwealth v. Wilmer*, 194 A.3d 564, 567–68 (Pa. 2018) (quotations and citations omitted). "One such exception is consent, voluntarily given. … Where the underlying encounter is found to be lawful, voluntariness becomes the exclusive focus." *Commonwealth v. Strickler*, 757 A.2d 884, 888[–89] (Pa. 2000). The Superior Court confirmed that "[w]ith regard to consent, 'voluntariness' is a question of fact to be determined from the totality of the circumstances." *Commonwealth v. Frederick*, 230 A.3d 1263[, 1267] (Pa. Super. 2020).

\* \* \*

[Lear] was clearly aware that the individuals he was interacting with were law enforcement as they were dressed in and carrying tactical gear. Marshal Clark did not ask for consent to enter the house but rather did so *at the request of the Defendant*. It is noteworthy that [Lear] requested Marshal Clark to return cash, which is not something that could normally be left on the front stoop or inside a screen door and the regular door of the house.

> Given the totality of the circumstances, including [Lear's] express request that the Marshal return the cash to his grandmother who was in the house, Marshal Clark acted reasonably in (i) interpreting [Lear's] words as consent to enter the residence, and (ii) entering the house through the "ajar or opened" front door. By noticing the items in plain view in the foyer and relaying them to the detective, the Marshal did not violate [Lear's] constitutional rights.

Trial Court Opinion, 4/15/22, at 25–29.

The record supports the trial court's factual findings, and we discern no error of law in its conclusions, which we adopt as our own. With respect to the traffic stop, we observe that the purpose of the stop was not completed until Officer Leporace could determine the identity of the driver of the car to issue a citation. His subsequent decision to let Lear go does not retroactively remove the reasonable suspicion that he possessed in observing Lear and his passenger. As to the house, the record supports the trial court's finding that Lear voluntarily consented to Marshal Clark entering the house; therefore, we need not address Lear's subsidiary claim that the search warrant would be stale without Marshal Clark's observations. Accordingly, we affirm the trial court's denial of Lear's suppression motions.

**II. Because Montgomery County ordered that delays caused by the judicial emergency were "court postponements," we will remand for a hearing on whether the Commonwealth exercised due diligence in bringing Lear to trial.**

Lear's remaining issue concerns the denial of his motion to dismiss under Pennsylvania Rule of Criminal Procedure 600(D). This implicates the effect of a series of emergency orders entered in the Court of Common Pleas of the 38th Judicial District of Pennsylvania (Montgomery County).

The criminal complaints against Lear were filed on May 19, June 8, and July 17, 2020. Lear's non-jury trial commenced on November 1, 2021, more than 365 days after the filing of all three complaints.[3] Lear argues that although Montgomery County declared a judicial emergency, the delay in his cases was not excludable when it was feasible to hold trial, noting that other court divisions and other counties held trials while his case was pending.

In general, a trial court's denial of a Rule 600 motion is reviewed for an abuse of discretion; however, it is subject to plenary review when "the dispositive question implicates legal issues." *Commonwealth v. Harth*, 252 A.3d 600, 614 n.3 (Pa. 2021).

Rule 600 provides in relevant part:

**(A) Commencement of Trial; Time for Trial**

(1) For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or nolo contendere.

(2) Trial shall commence within the following time periods.

(a) Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.

\* \* \*

**(C) Computation of Time**

(1) For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be

---

[3] The time to resolve Lear's suppression motions is not automatically excluded because the trial court did not rule on the motions until immediately before trial. *See Commonwealth v. Hill*, 736 A.2d 578, 587 n.7 (Pa. 1999).

included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.

\* \* \*

**(D) Remedies**

(1) When a defendant has not been brought to trial within the time periods set forth in paragraph (A), at any time before trial, the defendant's attorney, or the defendant if unrepresented, may file a written motion requesting that the charges be dismissed with prejudice on the ground that this rule has been violated. A copy of the motion shall be served on the attorney for the Commonwealth concurrently with filing. The judge shall conduct a hearing on the motion.

Pa.R.Crim.P. 600.[4]

In a Rule 600 analysis, the "mechanical run date" is 365 days after the complaint was filed. **Harth**, 252 A.3d at 607 n.7 (citation omitted); **see** Pa.R.Crim.P. 600(A)(2)(a). The "adjusted run date" is then calculated by adding any time that is "excluded from the computation" under Rule 600(C)(1).[5] If a defendant is not brought to trial by the adjusted run date, the case is dismissed. Two key cases guide our analysis here.

First, in **Harth**, our Supreme Court held that "before a trial court excludes time from its Rule 600 time computation on the basis of 'judicial delay,'" the Commonwealth must "demonstrate that it acted with due

---

[4] Rule 600(B) limits pretrial incarceration. This Opinion concerns only the provisions and authority related to commencement of trial.

[5] Before Rule 600 was replaced in 2013, our cases distinguished "excludable time" and "excusable delay." **See, e.g.**, **Commonwealth v. Goldman**, 70 A.3d 874, 879 (Pa. Super. 2013). Rule 600 now eliminates this distinction. **Commonwealth v. Wiggins**, 248 A.3d 1285, 1289 (Pa. Super. 2021).

- 14 -

diligence." ***Harth***, 252 A.3d at 617 (adopting the logic of ***Commonwealth***

***v. Mills***, 162 A.3d 323, 327 (Pa. 2017) (Wecht, J., concurring)). That is:

> [I]n ruling on a defendant's Rule 600 motion to dismiss, a trial court must first determine whether the Commonwealth has met its obligation to act with due diligence throughout the life of the case; if the Commonwealth meets its burden of proving due diligence, only then may the trial court rely upon its own congested calendar or other scheduling problems as justification for denying the defendant's motion.

***Id.*** at 618.

Second, this Court considered the effect of local emergency orders in

***Commonwealth v. Carl***, 276 A.3d 743 (Pa. Super. 2022). The issue in ***Carl***

was whether a period of a local judicial emergency would be excluded from

the Rule 600 computation, *i.e.*, whether to add the days of the judicial

emergency to the run date. The relevant order contained two provisions:

"Suspend statewide rules pertaining to the rule-based right of criminal

defendants to a prompt trial," and: "Any postponement caused by the judicial

emergency shall be considered a court postponement and shall constitute

excludable time for purposes of the application of Rule 600." ***Id.*** at 747

(citation omitted). This Court read the first provision as an absolute,

unqualified suspension and the second provision as a supplemental rule for

additional postponements. ***Id.*** at 750. The second provision set a local policy

to address ongoing delays. ***Id.*** Because the first provision unambiguously

suspended Rule 600, the days of that suspension should have been added to

the run date regardless of the Commonwealth's diligence. ***Id.*** at 751.

*Harth* and *Carl* frame the inquiry for the effect of emergency orders on Rule 600. If an order unambiguously suspends Rule 600 without qualification, then the period of the suspension is added to the run date without considering the Commonwealth's diligence. *Carl*, 276 A.3d at 751. Alternatively, if an order characterizes a delay as a court postponement, then that period is only excluded if the trial court determines after a hearing that the Commonwealth exercised due diligence through the life of the case. *Harth*, 252 A.3d at 618.

The relevant local emergency orders are as follows.[6] On March 16, 2020, Montgomery County declared a judicial emergency and ordered that the operation of Rule 600 would be suspended "during the period of the local judicial emergency." Declaration, 3/16/20. On March 31, 2020, Montgomery County extended the judicial emergency to April 30, 2020, again ordering Rule 600 to be suspended. Declaration, 3/31/20. On April 14, 2020, Montgomery County extended the judicial emergency to May 31, 2020.

On May 5, 2020, Montgomery County entered an order rescinding its previous orders effective May 31, 2020. Order, 5/5/20, at 1. It listed virus-related protocols that would be effective June 1, 2020. *Id.* at 1–2.

On May 28, 2020, Montgomery County declared that the local judicial emergency would be extended "until further Order of Court." Declaration, 5/28/20. It ordered that its declaration included the provisions of the order from May 5, 2020. *Id.*

---

[6] Copies of coronavirus-related orders from all Pennsylvania courts are available at https://www.pacourts.us/ujs-coronavirus-information.

- 16 -

On June 3, 2020, Montgomery County ordered "that any postponement of criminal case scheduling caused by the declaration of this judicial emergency, from March 12, 2020 through the expiration of the judicial emergency, shall be considered a court postponement and shall constitute excludable time for purposes of the application of Rule of Criminal Procedure 600." Order, 6/3/20. This lasted until August 31, 2021. **See** Order, 8/30/21. It is this period, from June 3, 2020 through August 31, 2021, that is in dispute in this case.

We reject Lear's challenge to Montgomery County's authority to suspend the operation of Rule 600(C) based on actual ability to hold jury trials and the experiences of other counties. The Supreme Court of Pennsylvania authorized president judges to suspend this rule beginning March 16, 2020. **In re General Statewide Judicial Emergency**, 228 A.3d 1281, 1282 (Pa. 2020).[7] Therefore, Montgomery County's suspension of Rule 600 was valid, without the need for a separate showing that it was unable to hold jury trials.

However, the plain language of the orders reflects that Montgomery County did not continue its unqualified suspension of Rule 600 beyond May 31, 2020. On May 5, 2020, Montgomery County ordered that its previous orders would be rescinded effective May 31, 2020. There were no later orders suspending Rule 600. Instead, Montgomery County opted to order on June 3,

_____

[7] Two days later, the Supreme Court of Pennsylvania ordered a statewide Rule 600 suspension that would last through June 1, 2020. **See In re General Statewide Judicial Emergency**, 230 A.3d 1015, 1019 (Pa. 2020).

- 17 -

2020, that any emergency-related delay "shall be considered a court postponement and shall constitute excludable time" under Rule 600(C).

As in ***Carl***, the plain meaning of the "court postponement" provision was to establish a framework for applying Rule 600 to any postponement caused by the local judicial emergency. ***Carl***, 276 A.3d at 750. Unlike in ***Carl***, however, the Montgomery County orders did not separately provide that Rule 600 would be suspended after May 31, 2020.

Here, the trial court found, in accordance with the plain meaning of the Montgomery County emergency orders, that the delay in bringing Lear's cases to trial was a direct result of the judicial emergency. For such judicial delay to be excluded from the Rule 600(C) computation, the trial court must find that the Commonwealth exercised due diligence. ***Harth***, 252 A.3d at 618.

Because the trial court did not afford the Commonwealth the opportunity to prove its diligence, we remand for a hearing under Rule 600(D). If the trial court determines after the hearing that the Commonwealth did not meet its burden to show due diligence, then it should vacate the sentences and convictions, dismiss the charges, and discharge Lear at these docket numbers. If the trial court determines that the Commonwealth exercised due diligence, then it should deny Lear's motion to dismiss; Lear's judgments of sentence would remain extant, and Lear would be able to appeal the Rule 600 determination.

Order denying suppression affirmed. Case remanded for a hearing pursuant to Pennsylvania Rule of Criminal Procedure 600(D). Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/01/2023