**[J-40A-2024, J-40B-2024 and J-40C-2024] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 90 MAP 2023 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 700 EDA |
| | : | 2022, entered on February 1, 2023, |
| v. | : | Affirming and Remanding the |
| | : | Judgment of Sentence of the |
| | : | Montgomery County Court of |
| JASON ANDREW LEAR, | : | Common Pleas, Criminal Division, at |
| | : | No. CP-46-CR-0002239-2020 |
| Appellee | : | entered on February 16, 2022. |
| | : | |
| | : | ARGUED:  May 15, 2024 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 91 MAP 2023 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 701 EDA |
| | : | 2022, entered on February 1, 2023, |
| v. | : | Affirming and Remanding the |
| | : | Judgment of Sentence of the |
| | : | Montgomery County Court of |
| JASON ANDREW LEAR, | : | Common Pleas, Criminal Division, at |
| | : | No. CP-46-CR-0002816-2020 |
| Appellee | : | entered on February 16, 2022. |
| | : | |
| | : | ARGUED:  May 15, 2024 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 92 MAP 2023 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 702 EDA |
| | : | 2022, entered on February 1, 2023, |
| v. | : | Affirming and Remanding the |
| | : | Judgment of Sentence of the |
| | : | Montgomery County Court of |
| JASON ANDREW LEAR, | : | Common Pleas, Criminal Division, at |
| | : | No. CP-46-CR-0003882-2020 |
| Appellee | : | entered on February 16, 2022. |
| | : | |
| | : | ARGUED:  May 15, 2024 |

**DISSENTING OPINION**

**JUSTICE WECHT**                                                                 **DECIDED:  October 24, 2024**

Recently, in *Commonwealth v. Harth*, we confirmed the fundamental speedy trial principle that a prosecutor's obligation to act with due diligence lasts "throughout the life of the case."[1]  This burden is triggered when a criminal complaint is filed, and ends only when the case is called for trial.  The prosecutor is duty-bound to undertake all reasonable efforts in order to ensure that a criminal case constantly is moving forward.  The obligation is unceasing, continuing even during those natural lulls which occur between court hearings, as the case moves through the court system.[2]  A prosecutor must monitor his or her cases, and must maintain "simple recordkeeping systems" in order to ensure that no cases are forgotten or that none fall through the cracks.[3]

Thus, we recognized in *Harth* what always has been true.  With regard to due diligence, a prosecutor gets no time-outs.  A prosecutor must act with due diligence "throughout the life of a case."  That was the law of Pennsylvania, until now.  Today's Majority unnecessarily creates a loophole in this venerable rule, disrupting settled law. This new loophole is not required by the particular circumstances of this case nor by Rule 600 itself.  I respectfully dissent.

---

[1]      252 A.3d 600, 618 (Pa. 2021).

[2]      *See Commonwealth v. Mills*, 162 A.3d 323, 325 (Pa. 2017) (holding that the time associated with the normal progression of a criminal case does not constitute delay, and, thus is attributable to the Commonwealth in a Rule 600 calculation).

[3]      *Commonwealth v. Browne*, 584 A.2d 902, 906 (Pa. 1990).  *But see Commonwealth v. Bradford*, 46 A.3d 693, 705 (Pa. 2012) (holding that a prosecutor acts with due diligence by relying upon the magisterial district judge's personnel to forward paperwork in a criminal case to the court of common pleas for trial).  *But also see Mills*, 162 A.3d at 327 n.2 (Wecht, J., concurring) (expressing need to reconsider the Court's broad interpretation of due diligence in *Bradford*).

The COVID-19 pandemic disrupted nearly every aspect of American life, from the way we shopped for groceries to the way our children attended school. Our court system was no exception. On March 16, 2020, this Court declared a "general, statewide judicial emergency . . . on account of COVID-19."[4] Rather than impose a singular statewide protocol, we instead delegated to the president judges of each of Pennsylvania's sixty judicial districts the responsibility to determine, and then implement, "the appropriate measures to be taken to safeguard the health and safety of court personnel, court users, and members of the public."[5] To this end, we bestowed on president judges the authority to take certain actions not otherwise permitted in the normal course. We approved the use of "advanced communication technology to conduct court proceedings," and we granted leave to "suspend time calculations for the purposes of time computation relevant to court cases or other judicial business."[6] Relevant here, we also specifically authorized president judges to "suspend the operation of Rule of Criminal Procedure 600."[7] The "purport of the suspension [was] that the time period of the local judicial emergency . . . [would] be excluded from the time computation under Rule of Criminal Procedure 600(C)."[8]

That some aspects of our judicial system were temporarily suspended did not mean that all of them were. We directed president judges to "arrange for the provision of essential judicial services, including, by way of example, arraignments and bail establishment hearings, protection from abuse proceedings, where absent such

---

[4] In re: General Statewide Emergency, 228 A.3d 1281, 1281 (Pa. 2020) (*per curiam*).

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

proceedings there would be a threat of domestic violence, and/or injunction proceedings, where absent such proceedings there would be the threat of irreparable harm."[9]

Two days later, we issued a second order declaring that our courts were "generally closed to the public."[10] Closing the doors of the courthouses did not mean that the entirety of our judicial system came to a screeching halt. We continued to allow the use of "advanced communication technology" for non-essential functions, while directing that essential functions—largely those proceedings pertaining to bail, probation detainers, and juvenile detention—had to proceed, so long as those proceedings were conducted as safely as possible.[11]

More orders would follow. On April 1, 2020, we extended the emergency declaration for another thirty days.[12] Once again, we closed all courts in order to limit in-person contact, but still recognized that the entirety of the court system could not simply cease operations. While we directed that "any in-person pretrial conference, case management conference, status conference, diversionary program, discovery motions practice, motions practice or other hearing, whether civil or criminal" be postponed, we explained that such hearings could proceed if conducted by "advanced communication technology."[13] We also "clarifie[d]" that we "expect[ed] that non-essential matters can continue to move forward, within the sound discretion of President Judges, so long as judicial personnel, attorneys, and other individuals can and do act in conformity with

---

[9]     *Id.*

[10]     In re: General Statewide Judicial Emergency, 228 A.3d 1283, 1283 (Pa. 2020) (*per curiam*).

[11]     *Id.* at 1285-86.

[12]     In re: General Statewide Judicial Emergency, 229 A.3d 229, 229 (Pa. 2020) (*per curiam*).

[13]     *Id.* at 230.

orders and guidance issued by the executive branch."[14]  For "essential functions," in-person proceedings were permitted, but had to be held in "courtrooms designated by the individual courts of common pleas to minimize person-to-person contact."[15]

We again suspended Rule 600.  As in our March 16, 2020 order, we explained what this meant:  "[t]he purport of this directive is that the time period of the statewide judicial emergency and continuing order through April 30, 2020, SHALL BE EXCLUDED from the time calculation under Rule 600(C)."[16]

On April 28, 2020, by order, we extended the statewide judicial emergency until June 1, 2020.[17]  We noted that our "courts have remained operational, albeit with significant limitations due to the current pandemic,"[18] and we announced that, beginning on May 4, 2020, the courts "shall be open to conduct all court business,"[19] so long as that was done using strict restrictions on in-person contact.  We instructed our courts to "put forth their best efforts to accomplish the timely administration of justice."[20]

We maintained our prior suspensions of the time periods for filing documents and of Rule 600.  We expressly suspended all jury trials, for the time being.[21]  We identified, and prioritized, certain "critical court functions" that were of the "highest priority" and that must proceed, either via restricted in-person proceedings or via "advanced

---

[14]     *Id.* at 231.

[15]     *Id.* at 230.

[16]     *Id.* at 232 (capitalization in original).

[17]     In re: General Statewide Judicial Emergency, 230 A.3d 1015, 1015 (Pa. 2020) (*per curiam*).

[18]     *Id.*

[19]     *Id.* (capitalization modified).

[20]     *Id.* (capitalization modified).

[21]     *Id.* at 1018.

communication technology," including hearings related to, *inter alia*, emergency bail matters, probation detainers, bench warrants, juvenile detention, and preliminary hearings for incarcerated persons.[22]

Then, on May 27, 2020, we announced the end of the statewide judicial emergency. We declared that all of our prior orders would "expire according to their own terms," on June 1, 2020.[23] To reiterate, Rule 600 had been suspended in all judicial districts for the duration of the statewide emergency. This meant that all of March, April, and May of 2020 had to be excluded from tabulating the relevant time periods in a Rule 600 calculation. We never mentioned due diligence, and we never relieved the Commonwealth of its burden to act with such diligence "throughout the life of the case."[24] To the contrary, our orders made clear that, although some aspects of the court system had to be suspended, that system, including the work of judges, prosecutors, and defendants (and their attorneys), continued to operate, albeit in a modified way. Prosecutors, integral and necessary participants in nearly every aspect of our criminal justice system, were never given leave to passively await for the pandemic to let up or to leave countless cases—and many incarcerated defendants—in a standstill position. If these cases could not proceed to jury trials, they also could not simply be shelved.

In our May 27, 2020 order, we ended the statewide emergency. We left to the president judges the decision of how to proceed going forward. It was then up to the president judges to decide whether the pandemic continued to present a local emergency, and whether to continue to "exercise emergency powers" in their individual districts after

---

[22]   *Id.* at 1018.

[23]   *In re: General Statewide Judicial Emergency*, 234 A.3d 408, 408 (Pa. 2020) (*per curiam*) (capitalization modified).

[24]   *Harth*, 252 A.3d at 618.

our involvement ended.[25]  The President Judge of Montgomery County ("the President Judge") did just that.  It was a period during that time that gave rise to the Rule 600 dispute in this case.

In accordance with the authority provided by our initial 2020 orders, the President Judge first declared a local judicial emergency on March 12, 2020.  The President Judge issued a series of subsequent orders extending the local emergency status, keeping the courts closed to the public, and announcing and implementing an evolving series of protocols.  Those orders treated Rule 600 in different ways.  At first, the President Judge ordered that Rule 600 "shall be suspended in the 38th Judicial District during the period of the local judicial emergency."[26]  Two weeks later, however, the President Judge stated by separate order that "any postponement of criminal case scheduling caused by the declaration of this judicial emergency shall be considered a court postponement and shall constitute excludable time for purposes of the application of [Rule 600]."[27]

On May 28, 2020, the President Judge issued an order declaring that the local judicial emergency would extend "until further Order of Court."[28]  Then came our June 1, 2020 order ending the statewide emergency and delegating the handling of the day-to-day management of the pandemic to the president judges of each county.  Two days after that, on June 3, 2020, the President Judge entered an order extending the local emergency declaration in Montgomery County and, relevant herein, prescribing the manner in which Rule 600 would operate from that point until the end of the emergency.  Rather than suspend Rule 600 entirely, as had been done during the initial stages of the

---

[25]    In re: General Statewide Judicial Emergency, 234 A.3d at 408.

[26]    38th Jud. Dist. Declaration, 3/31/2020, at 1.

[27]    38th Jud. Dist. Declaration, 4/14/2020, at 1.

[28]    38th Jud. Dist. Declaration, 5/28/2020, at 1.

beginning of the pandemic, the President Judge instead announced that "any postponement of criminal case scheduling caused by the declaration of this judicial emergency, from March 12, 20202, through the expiration of the judicial emergency, shall be considered a court postponement and shall constitute excludable time for purposes of [Rule 600]."[29] This order continued in effect until August 31, 2021,[30] shortly after this Court rescinded our June 1, 2020 order authorizing president judges to declare local emergencies and mandated that all of Pennsylvania's courts return to "pre-pandemic status, . . . fully opened and staffed by judges and other personnel."[31]

The entirety of the time period at issue in the case *sub judice*—June 3, 2020 to August 31, 2021—occurred under the governance of the President Judge's June 3, 2020 order. This Court afforded the President Judge the authority—and discretion—to decide how to characterize delays under Rule 600. In exercising that authority, the President Judge could not have been more clear: this time was to be categorized as a "court postponement." This designation differs in name only from the more common term, "judicial delay." As such, the time at issue here falls squarely within the ambit of our recent decision in *Harth*.

Like today's case, *Harth* implicated the order of operations in a Rule 600 analysis. There, we were asked to "consider whether a trial court may rely upon its own availability as justification for denying a defendant's motion to dismiss pursuant to [Rule 600], without first requiring the Commonwealth to demonstrate that it acted with due diligence in prosecuting the defendant's case."[32] In other words, what question must a court first ask:

---

[29]     In re: Judicial Emergency Order, 6/3/2020, at 1.

[30]     In re: Judicial Emergency Order, 8/30/2021, at 1.

[31]     *In re: General Statewide Judicial Emergency*, No. 533 Judicial Administration Docket, 6/21/2021, at 1.

[32]     *Harth*, 252 A.3d at 603.

(1) Did the prosecutor act with due diligence?; or (2) Was the delay caused by the court? We held that it had to be the former.[33] Today's decision obscures, and even flouts, that clear ruling.

Harth and a co-defendant were charged with robbery and associated crimes related to a home invasion in Philadelphia.[34] As trial approached, the prosecutor repeatedly failed to provide Harth with all of the discovery materials necessary for Harth to prepare his defense. The case had to be postponed numerous times to allow the prosecutor more time to produce the discovery materials. After even more postponements, one of which was due to the Pope's visit to Philadelphia, Harth filed a motion to dismiss pursuant to Rule 600. The trial court once again delayed Harth's trial, this time in order to hold a hearing on the motion to dismiss. After the hearing, the trial court denied the motion. The court found that much of the delay in bringing Harth to trial was due to the court's unavailability. The court stated that, while it had considered the prosecutor's repeated failure to produce the discovery materials, it nonetheless found the court's busy calendar to be the dispositive factor for Rule 600 purposes.[35]

When the parties appeared the next day for trial, the prosecutor handed Harth a discovery packet filled with fifteen new, and previously undisclosed, exhibits. Harth immediately filed a second Rule 600 motion, arguing again that the prosecutor had not acted with due diligence throughout the case. The prosecutor made no attempt to demonstrate that he had acted with due diligence at any point, particularly with regard to his sustained failure to comply with his discovery obligations. Instead, the prosecutor stated, "I mean, Your Honor, frankly, you already denied the motion. There hasn't been

---

[33] *Id.*

[34] *Id.*

[35] *Id.* at 605-06 (references to the notes of testimony omitted).

a change of circumstance. The last continuance was not on the Commonwealth. So it was denied."[36] The trial court agreed, and it denied the motion. Rather than holding the prosecutor to his burden to prove his due diligence,[37] the trial court instead blamed Harth for not presenting any evidence of the prosecutor's lack of due diligence.

Reversing the burden of proof was not the trial court's primary basis for denying the Rule 600 motion. Even though the prosecutor repeatedly was not ready to proceed, the real culprit blamed for the delays was the court's own packed schedule. The court refused "to hold the Commonwealth responsible."[38] A jury trial followed, and Harth was convicted of various crimes. Harth appealed, and the Superior Court reversed the trial court's Rule 600 ruling. The Superior Court remanded the case, instructing the trial court to hold a hearing to decide which party was responsible for each delay and to decide whether the prosecutor had acted with due diligence. Believing that the remand constituted an unwarranted second bite of the apple for the Commonwealth, Harth filed a petition for allowance of appeal with this Court.[39]

We reversed, vacated the judgment of sentence, and discharged Harth.[40] In doing so, we held that the trial court conducted its Rule 600 analysis in the incorrect sequence. We explained that considering the impact of "judicial delay" before, over, and above the Commonwealth's obligation to act with due diligence is not an uncommon occurrence.[41]

---

[36] *Id.* at 606 (quoting Notes of Testimony ("N.T."), 11/28/2016, at 24).

[37] *See Browne*, 584 A.2d at 908 ("It is the Commonwealth's burden to prove prosecutorial due diligence by a preponderance of the evidence.").

[38] *Harth*, 252 A.2d at 606 (quoting N.T., 11/29/2016, at 24).

[39] *Id.* at 608-09.

[40] *Id.* at 603, 622.

[41] *Id.* at 616.

Drawing upon my concurrence in *Commonwealth v. Mills*,[42] this Court explained that the assertion of "judicial delay" does not alter the analytical sequence mandated by the plain text of Rule 600. We held that "'a linear reading of [Rule 600] requires courts first to consider the Commonwealth's role in causing the delay at issue,' and only after the Commonwealth proves that it acted with due diligence throughout the case should a court consider other causes for delay in bringing a defendant to trial."[43] "Although not a model of clarity," the rule requires that "periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence."[44] Because the burden to act with due diligence exists "at all times during the pendency of a case,"[45] we held that, when analyzing a Rule 600 motion to dismiss, "a trial court must first determine whether the Commonwealth has met its obligation to act with due diligence throughout the life of the case[.]"[46] If, and only if, the Commonwealth makes this showing can a court consider the impact of "judicial delay" on bringing a defendant to trial.[47]

Because there is no meaningful, substantive difference between a "court postponement" and "judicial delay," consideration of the "court postponement" at issue presently in the context of a Rule 600 challenge must proceed along the same analytical

---

[42]   *See Mills*, 162 A.3d at 325-27 (Wecht, J., concurring).

[43]   *Harth*, 252 A.3d at 616 (quoting *Mills*, 162 A.3d at 326 (Wecht, J., concurring)). *See also Mills*, 162 A.3d at 326 (Wecht, J., concurring) ("'Judicial delay' is not a mechanism or totem that exempts the Commonwealth from its obligations under the Rule. It may be invoked only after the Commonwealth has demonstrated that it is ready, able, and willing to proceed with the case against the defendant.").

[44]   *Id.* at 617 (quoting Pa.R.Crim.P. 600(C)(1)) (emphasis omitted).

[45]   *Commonwealth v. Hawk*, 597 A.2d 1141, 1145 (Pa. 1991).

[46]   *Harth*, 252 A.3d at 618.

[47]   *Id.*

progression that we mandated in *Harth*. First, the court must assess whether the Commonwealth acted with due diligence at all times throughout the life of the case. Then, and only then, can the court assess the impact of "court postponements," a.k.a. "judicial delay." This is precisely what the Superior Court held below.[48] That court ordered that the case be remanded for the Commonwealth to demonstrate that it was diligent throughout the life of Lear's case. Under *Harth*, the Superior Court was correct to do so.[49]

The Majority sidesteps this seemingly unavoidable result. It does so by recasting the relevant time period as "other periods of delay"[50] under Rule 600.[51] Because of this mischaracterization, prosecutors now are relieved of their burden to prove due diligence in all pandemic-related cases, as well as in every case that can be said to involve "other periods of delay." To achieve this result, the Majority has to reclassify the time period at issue, circumvent Rule 600's order of operations, and disregard the plain meaning of our recent decision in *Harth*.

---

[48]     *Commonwealth v. Lear*, 290 A.3d 709, 720 (Pa. Super. 2023).

[49]     The Superior Court was faced with a jurisprudential conflict. On the one hand, considering the fact that the delay here specifically was deemed by the President Judge to be a "court postponement," *Harth* required a demonstration of due diligence. On the other hand, a different panel of the Superior Court previously had held in *Commonwealth v. Carl*, 276 A.3d 743, 751 (Pa. Super. 2022), that such pandemic-related time, even when designated as a "court postponement," had to be excluded from a Rule 600 calculation without any consideration of the Commonwealth's due diligence. The Superior Court was correct to apply *Harth* instead of *Carl*. I would overrule *Carl*, and any other cases holding the same, forthwith.

[50]     Pa.R.Crim.P. 600(C)(1) ("For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.").

[51]     *See* Maj. Op. at 17.

The Majority's characterization of the relevant time period in question obviously differs from the President Judge's designation of that period. We gave the President Judge the authority and discretion to designate the pandemic-related delays as he saw fit. The President Judge chose to deem those periods "court postponements." Even though the choice was authorized (and reasonable) by reason of both this Court's order and Rule 600, the Majority now declares that the President Judge somehow was wrong. But, the President Judge was not asked to choose between right or wrong options. The President Judge was given sole authority to decide. He decided that the time would constitute judicial delay. The Majority makes no meaningful effort to explain why it is necessary or appropriate for this Court now to second-guess the President Judge's choice. But, the reason is obvious to anyone who reads today's opinion. Today's Court disagrees with its own recent decision in *Harth*. It uses this unique, pandemic-related case to limit that decision.

The Majority asserts repeatedly that *Harth* created a limited exception to Rule 600's mandate.[52] This erroneous claim emanates from the Majority's fundamental misunderstanding of both *Harth* and the order of operations in a Rule 600 analysis. As I explained in my concurrence in *Mills*, which a majority of this Court adopted in *Harth*,[53] "[s]ubsection (C)(1) of the Rule provides the computational methodology that courts must utilize to determine whether there was a violation of the defendant's speedy trial right."[54] "[A] linear reading of the provisions requires courts first to consider the Commonwealth's

---

[52] *Id.* at 9, 13, 15-17, 17 n.8 and 18 n.9.

[53] Today's Majority seeks to avoid *Harth* by calling that decision "sharply divided." *See* Maj. Op. at 14. Whether sharp or dull, the majority rules. *Harth* is binding precedent that today's Majority wishes to ignore.

[54] *Mills*, 162 A.3d at 326 (Wecht, J., concurring).

role in causing the delay at issue."[55]  The first thing that the Rule instructs courts to do, when determining whether time is excludable, is to consider whether the Commonwealth caused any delay "at any stage of the proceedings when the Commonwealth has failed to exercise due diligence."[56]  When we held in *Harth* that any time attributable to "judicial delay" could occur only after an assessment of the Commonwealth's diligence, we were not creating some limited exception to the rule.  To the contrary, we held that courts must follow the path expressly prescribed by the rule.  This order of operations is mandated not only by the text of the rule, but also by the long-standing axiom that prosecutors are duty-bound to act with due diligence at every stage of a criminal case, and throughout its duration.

Because it misconstrues Rule 600's analytical sequencing, the Majority asserts that *Harth*'s mandate is limited to cases involving periods of "judicial delay."[57]  This is incorrect.  The computation of time sequencing is the same in every case, regardless of the facial nature of the delay.

The Majority maneuvers around the due diligence inquiry, and proceeds directly to the "other periods of delay" categorization, by ignoring yet another critical aspect of the rule.  The Majority insists that the Commonwealth is not required to demonstrate due diligence because the delay here was not caused by the Commonwealth.  In the Majority's view of Rule 600, a court in such a situation would never have to consider whether the Commonwealth has acted with due diligence.  The Majority wholly disregards the possibility that it will be the Commonwealth's lack of due diligence that *caused* the delay.  That is why Rule 600 requires consideration of the Commonwealth's actions first, and

---

[55]     *Id.*

[56]     Pa.R.Crim.P. 600(C)(1).

[57]     Maj. Op. at 15.

that is why we held in *Harth* that "judicial delay" comes after an assessment of the Commonwealth's due diligence. Under the Majority's reconfigured version of Rule 600, courts will never even get to the question of due diligence if the delay facially appears attributable to some outside factor.[58] To not require all prosecutors to prove due diligence means that some prosecutors will not act with due diligence.

Underpinning our decision in *Harth* is the concern that, if prosecutors are not required to demonstrate due diligence in every criminal case, and for the life of the case, it would be all too easy for a prosecutor to let a case linger, and to let a defendant needlessly languish in jail without consequence if the delay outwardly appears to have been caused by an external factor. To avoid this abdication of a prosecutor's duty, the rule requires consideration of the actions of the prosecutor first. A prosecutor must be "ready, able, and willing to proceed with the case against the defendant. Otherwise, the due diligence component of Rule 600 would have little, if any, meaningful import."[59] The Majority not only breathes life back into the pre-*Harth* problem; it makes matters worse. By the Majority's doing, the next time there is a public health crisis, a prolonged weather

---

[58] The Majority and I agree that the "pertinent computational provision" begins with consideration of whether any delays in bringing a defendant to trial were "caused by the Commonwealth." *Id.* at 13 n.7. But we differ as to the manner in which a court must proceed in making this initial assessment. The Majority asserts that the plain text of the rule requires that a court first assess causation, and, if the delay was caused by the Commonwealth, then, and only then, a court should consider due diligence. *Id.* Contrary to the Majority's insistence, the rule requires that a court consider, not ignore, due diligence as part of the initial causation inquiry. This inquiry is necessary because the failure to do so as part of the initial causation analysis precludes entirely the possibility that it was the Commonwealth's lack of due diligence that caused the delay. In such a circumstance, that delay would be attributable to the Commonwealth. However, a court proceeding under the Majority's interpretation of Rule 600 would never unearth those types of delays, because the Majority does not require a court to look for them. Turning a blind eye to these prosecutorial delays undermines both the text of the rule and the long-standing principle that prosecutors must act with due diligence at all times.

[59] *Mills*, 162 A.3d at 326-27 (Wecht, J., concurring).

emergency, or some other extended natural occurrence that delays court proceedings, prosecutors can feel free to forget about their cases, put their feet up, and do nothing to advance the case as they await resumption of the normal state of affairs. Prosecutors can rest assured that this Court will not require them to prove that they met the standard that this Court, through our rule making authority, previously had expected of them.

Prosecutors should proceed with caution. The Majority offers no advice to prosecutors on how one can determine in advance whether a circumstance is an "other period[] of delay." The prosecutor that relies upon today's Majority takes a substantial risk. That prosecutor will find out whether the period that he or she took off legally constituted an "other period of delay" only after the defendant files a motion to dismiss on Rule 600 grounds. The prosecutor cannot, and should not, depend upon the trial court's designation, as the Majority makes clear that such a designation cannot be trusted and is susceptible to our correction. If the prosecutor guesses wrong, and is deemed to have failed today's newly elasticized due diligence test, the case will be dismissed. The Majority not only allows this gamble, it encourages it. Prosecutors should avoid this wager by acting with, and being prepared to demonstrate, due diligence at all times.

Assume an alternate universe in which today's Majority is correct, and that what the President Judge here declared to be "court postponements" were instead "other periods of delay." Even under such a scenario it is not clear that such classification relieves prosecutors of their burden to prove due diligence. With regard to such periods, the explanatory comment to Rule 600 states that, "[i]f the delay occurred as the result of circumstances beyond the Commonwealth's control and despite its due diligence, the time is excluded."[60] The term "despite its due diligence" in conjunction with

---

[60] Pa.R.Crim.P. 600 cmt.

"circumstances beyond the control of the Commonwealth" indicates that exclusion of time related to "other periods of delay" can occur only after proof of due diligence.

The Superior Court in this case did not order the charges against Lear to be dismissed. Rather, it held that the Commonwealth was required to demonstrate that it had acted with due diligence. This is not a particularly onerous burden, especially in a case such as this one. The ongoing COVID-19 pandemic created barriers to many of the tasks that normally are accomplished easily under ordinary circumstances. Interviewing witnesses, gathering evidence, supplying discovery, participating in pre-trial hearings, and engaging in other necessary pre-trial duties likely were significantly hindered, if not rendered impossible, by the pandemic. The prosecutor was required merely to appear in court and explain his or her attempts and efforts under these circumstances to keep this case moving forward. Pandemic or not, the prosecutor's duty to act with due diligence lasts "throughout the life of the case."[61] That is all the law asks.

I would affirm the Superior Court's ruling.

Justice Donohue joins this dissenting opinion.

---

[61] *Harth*, 252 A.3d at 618.