J-A10017-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JOHN WILLIAM COLEMAN | : | |
| | : | |
| Appellant | : | No. 1197 EDA 2023 |

Appeal from the Judgment of Sentence Entered January 20, 2023
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0001550-2020

BEFORE: PANELLA, P.J.E., BECK, J., and COLINS, J.[*]

MEMORANDUM BY BECK, J.:            **FILED AUGUST 19, 2024**

John William Coleman ("Coleman") appeals from the judgment of sentence imposed following his convictions of ten counts of sexual abuse of children and one count of criminal use of a communication facility.[1] Coleman argues that the trial court erred in denying his motion to suppress evidence obtained from his cell phone; the police violated his Fifth Amendment rights by compelling him to provide his cell phone password; a violation of his speedy trial rights pursuant to Pa.R.Crim.P. 600; and raises a constitutional challenge

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6312(d), 7512(a).

to the statutory sex offender registration requirements under Pennsylvania's

Sexual Offender Registration and Notification Act ("SORNA").[2]  We affirm.

The trial court set forth the relevant facts as follows:

> On November 21, 2019, [Detective Jim] Reape [of the Montgomery County Detective Bureau] received a cyber tip from the Pennsylvania Internet Crimes Against Children Task Force ("Task Force").  The National Center for Missing and Exploited Children ("NCMEC")[3] had sent the cyber tip to the Task Force. MeWe, a social media application akin to Snapchat and Instagram, had sent information to NCMEC that a MeWe subscriber had uploaded two (2) images of suspected child pornography on September 17, 2019.  MeWe also provided the following information to NCMEC: (1) the name used by the subscriber to create an account with MeWe was Johnny Cole; (2) when creating a MeWe account, this subscriber listed a cell phone number of 215-870-[****]; and (3) a list of 12 IP addresses used by this subscriber to access MeWe.  Of these 12 IP addresses, nine (9) were owned by Verizon Wireless and three (3) were owned by Verizon Fios.  Verizon Wireless and Verizon Fios are internet service providers.  One of the three (3) IP addresses owned by Verizon Fios was 173.75.254.184 ("184 IP Address").
>
> On November 21, 2019, [Detective] Reape sent an administrative subpoena to Verizon Fios regarding the 184 IP Address, which had been used to access subscriber Johnny Cole's MeWe account on October 31, 2019.  [Detective] Reape sent this subpoena to Verizon Fios in an effort to further identify the MeWe subscriber that had uploaded the two (2) images of suspected child pornography.  As the tip provided by MeWe to NCMEC did not list the IP address used by its subscriber to upload the images on September 17, 2019, [Detective] Reape could not request this IP address from Verizon Fios.  [Detective] Reape selected a Verizon Fios IP address, the 184 IP Address, rather than one of

_____

[2] 42 Pa.C.S. §§ 9799.10–9799.42.

[3] NCMEC is a nonprofit organization that works with law enforcement regarding issues relating to missing and sexually exploited children and reducing the proliferation of child pornography.  NCMEC operates a cyber tipline, sex offender trafficking teams, and victim identification programs.

the nine (9) Verizon Wireless IP addresses in an attempt to learn the location from which the two (2) images were uploaded to MeWe.

Verizon Fios responded to [Detective] Reape that the 184 IP address was their address, but it was unassigned on October 31, 2019, which is the date provided to them by [Detective] Reape in his subpoena. [Detective] Reape did not subpoena records for any of the nine (9) Verizon Wireless IP addresses because such IP addresses can be shared with 100 other cell phones so any information derived from such an IP address is not particularly reliable. If any of the Verizon Wireless IP addresses had included a port, then that would identify the specific cell phone that had accessed the MeWe application. The Verizon Wireless IP addresses listed in the cyber tip that NCMEC provided to the Task Force did not include any port numbers so they would not indicate the particular cell phone that had accessed MeWe.

Since Verizon Fios was unable to provide the name of the person who had accessed the MeWe site on October 31, 2019, [Detective] Reape used the cell phone number provided in the NCMEC cyber tip in an effort to identify the identity of [the] MeWe user. [Detective] Reape searched for the cell phone number in a police database and found that this number had been listed for a John Coleman in a 2018 ambulance report. Per this report, an ambulance responded to an injury sustained by [Coleman], and the report listed John Coleman's address in the English Village apartment complex at [a specifically identified address in] Horsham Township. This address is within the 5-kilometer area of the 184 IP addressed that accessed MeWe on October 31, 2019.

[Detective] Reape identified this cell phone number as being associated with [Coleman] on December 2, 2019. On December 4, 2019, [Detective] Reape went to [Coleman's] employer, Jamison Home Services, in an effort to verify that the cell phone number was in [Coleman's] name and he still resided at 700 Lower State Road. [Coleman's] employer confirmed that the cell number 215-870-[****] was still [Coleman's] phone number, and he still resided at [the identified address]. Having verified this information, [Detective] Reape prepared a search warrant for the cell phone associated with that phone number.

The search warrant was approved on December 5, 2019. On the morning of December 6, 2019[,] at approximately 6:20

a.m., [Detective] Reape, along with Detective [Vincent] Higgins of the Montgomery County[ and] … Sergeant Adam Dunning of the Horsham Township Police Department, went to [Coleman's] address … to serve the search warrant. They were not in uniform. [Detective] Reape wore a vest with police markings. They approached [Coleman] as he exited his residence. They identified themselves as police officers. [Detective] Reape informed him that they were investigation child pornography through the MeWe app and asked him if he ever used that app. [Coleman] replied that he did for adult pornography. [Detective] Reape asked [Coleman] if he had the cell phone on him, and [Coleman] responded that it was inside his residence. They asked if they could enter his residence, and [Coleman] agreed.

[Detective] Reape asked [Coleman] if they could look at the MeWe app on his phone, and [Coleman] agreed to this request. [Coleman] opened the MeWe app on his phone and showed police a couple images of adult pornography. At that point, [Detective] Reape informed [Coleman] that they had a search warrant for his cell phone, and they had to take possession of it. [Coleman] then hit the phone's home button, which locked the phone.

[Detective] Reape asked [Coleman] if he would mind unlocking the phone, and [Coleman] inserted the code to unlock the phone. [Detective] Reape asked [Coleman] to provide his phone passcode, and [Coleman] did so. [Detective] Reape brought the phone to the Montgomery County Detective Bureau and downloaded its contents in the forensic lab. The Detective Bureau possessed Gray Key technology that allows it to access a cell phone's contents without having a passcode for the phone so the police would have been able to download the contents of [Coleman's] cell phone in the event he declined to provide the passcode. The demeanor of the police during the entire encounter with [Coleman] was cordial. They did not yell, raise their voices, or threaten [Coleman].

Trial Court Opinion, 8/23/2023, at 5-8 (footnotes omitted and bracketed footnote added).

The examination of the phone revealed numerous images of children engaged in sexual acts. On December 6, 2019, Detective Reape filed a

criminal complaint against Coleman charging him with nine counts of sexual abuse of children, graded as second-degree felonies, one count of sexual abuse of children, graded as a third-degree felony, and one count of criminal use of a communication facility, graded as a third-degree felony. A preliminary hearing was originally scheduled for January 14, 2020, but Coleman's counsel sought a continuance, which was granted, and the preliminary hearing was rescheduled for February 19, 2020. Following the hearing, the magisterial district judge bound the charges over for trial.

On February 19, 2020, Coleman sent a discovery request to the Commonwealth. After failing to receive a response, he sent another letter on March 4, 2020. On March 16, 2020, the Pennsylvania Supreme Court entered an order declaring a statewide judicial emergency because of the COVID-19 pandemic.[4] On April 14, 2020, Coleman filed an omnibus pretrial motion and

_____

[4] On March 16, 2020, the Pennsylvania Supreme Court authorized the President Judges to declare judicial emergencies within their respective judicial districts. Within those orders, the President Judges were authorized to suspend the operation of Pa.R.Crim.P. 600 within their districts. *In re: General Statewide Judicial Emergency*, 228 A.3d 1281 (Pa. 2020) (per curiam order); *see also In re Gen. Statewide Jud. Emergency*, 228 A.3d 1283, 1287 (Pa. 2020) (noting that as of March 19, 2020, "Rule of Criminal Procedure 600(C) is hereby SUSPENDED in all judicial districts during the period of the statewide judicial emergency"); *In re General Statewide Jud. Emergency*, 230 A.3d 1015 (Pa. 2020) (extending the Rule 600 suspension until June 1, 2020); *but see In re General Statewide Judicial Emergency*, 234 A.3d 408 (Pa. 2020) (per curiam order) (declaring that the statewide emergency shall end on June 1, 2020, but allowing President Judges of judicial districts to seek to extend local emergencies). As noted in more detail infra, the Montgomery County Court of Common Pleas specifically suspended the
*(Footnote Continued Next Page)*

a motion for discovery. In the motion for discovery, Coleman sought, inter alia, expert and state police reports; any photographs, regardless of whether the Commonwealth sought to introduce them at trial; and the names and addresses of all eyewitnesses. On May 12, 2020, Assistant District Attorney Erika Wevodau ("Wevodau") sent an email to Coleman's counsel, attaching discovery as well as the notice of formal arraignment, criminal complaint, affidavit of probable cause, and bail information. The following day, Coleman's counsel acknowledged receipt of the discovery, but indicated that all the requested police reports and expert reports were not included in the discovery. Wevodau did not respond to this request, and Coleman's counsel did not follow up with any further conversations about the discovery.

Following a pretrial conference on May 14, 2021, the trial court scheduled a bench trial for August 25, 2021. On July 1, 2021, Coleman filed an amended omnibus pretrial motion, and a second amended omnibus pretrial motion on July 21, 2021, which included a motion to suppress the evidence obtained from his phone and a motion to dismiss pursuant to Pa.R.Crim.P. 600.

Assistant District Attorney Emily D'Aguanno ("D'Aguanno") was assigned to this case in July 2021. She indicated to Coleman's counsel that discovery had been sent to Coleman on May 12, 2020 and that defense

_____

operation of Rule 600 until May 31, 2020, but extended the judicial emergency to August 30, 2021.

counsel had viewed the pornographic pictures at the preliminary hearing. D'Aguanno also asked counsel if he was missing any other discovery. By email dated July 20, 2021, Coleman's counsel replied that he was still seeking a list of witnesses and their contact information, any experts contacted by the Commonwealth, the Cellebrite report,[5] police reports, any confessions by Coleman, and the evidence that would be introduced at trial. D'Aguanno responded that she reserved the right to call any witness mentioned in discovery, but would not provide their contact information. She further stated that she could not provide the Cellebrite report because it contained child pornography, but that defense counsel could review the report when viewing the pictures.

On July 27, 2021, a court administrator emailed D'Aguanno and Coleman's counsel about scheduling a hearing on the discovery motion filed on April 14, 2020. D'Aguanno replied that defense counsel had not provided her a copy of the discovery motion or given her adequate time to respond to his informal discovery request. On August 4, 2021, D'Aguanno informed Coleman's counsel that she had reached out to every detective involved in the case. D'Aguanno provided reports from Detective Michael Henricks, which indicated the phone contained 1,108 images of child pornography. D'Aguanno also sent Detective Reape's updated report to defense counsel.

_____

[5] Cellebrite's software can extract data from a cell phone and generates a report about the extraction.

That same day, the trial court held a hearing on Coleman's April 14, 2020 motion for discovery. The next day, the trial court entered an order, directing the Commonwealth to provide Coleman all police reports related to the case, any statements made by Coleman and any *Brady*[6] material, expert reports, any cell phone reports, and any physical evidence other than child pornography. Subsequently, D'Aguanno provided the Cellebrite report, without any images, to defense counsel.

On August 11, 2021, D'Aguanno emailed defense counsel, advising him that she reviewed the photographs possessed by Coleman and that she planned to amend the bills of information. On August 12, 2021, Coleman's counsel sent D'Aguanno his expert's report. Because of the time needed to review Coleman's expert report, the Commonwealth's requested a continuance of the trial date. The trial court continued the trial scheduled for August 24, 2021, to September 14, 2021.

On September 13, 2021, the Commonwealth filed bills of information, charging Coleman with the same crimes, but changing the grading of the ten counts of sexual abuse of children to third-degree felonies; the count of criminal use of a communication facility remained a third-degree felony. That same day, the Commonwealth moved to file amended bills of information to include sixty-six images of child pornography. On September 14, 2021,

_____

[6] *Brady v. Maryland*, 373 U.S. 83 (1963).

despite the fact the Commonwealth was ready for trial, the trial court instead held a hearing on Coleman's suppression motion. The hearing took the entire day, and the trial did not occur on that date. On October 26, 2021, the trial court denied Coleman's suppression motion.

On March 4, 2022, court administration issued a notice of call of the trial list scheduled for March 28, 2022. Thereafter, the trial court scheduled a one-day bench trial on April 26, 2022. On that date, the trial court instead conducted a hearing on Coleman's Rule 600 motion, which he had filed in July 2021. The following day, the trial court denied the motion, and conducted a stipulated bench trial, incorporating the notes of testimony from the September 14, 2021 suppression hearing. The trial court also granted the Commonwealth's request to amend the bills of information in open court, and charged Coleman with five counts of sexual abuse of children, graded as third-degree felonies, five counts of sexual abuse of children, graded as second-degree felonies, and one count of criminal use of a communication facility, a third-degree felony. Ultimately, the trial court found Coleman guilty of the above-mentioned crimes, as amended.

On August 1, 2022, Coleman filed a motion for extraordinary relief, asking the trial court to reconsider its Rule 600 ruling and averring that the Commonwealth violated Rule 600 by failing to exercise due diligence throughout the case. The trial court denied this motion. The trial court then

sentenced Coleman to concurrent terms of seven years of probation. The trial

court also directed Coleman to register as a sex offender pursuant to SORNA.

Coleman filed a timely appeal. Thereafter, on September 21, 2022, Coleman filed a motion for remand with this Court following the decision in *Commonwealth v. Torsilieri*, No. 15-CR-0001570-2016 (Chester Co. filed Aug. 22, 2022) (finding SORNA unconstitutional). Coleman sought to file a post-sentence motion challenging the constitutionality of SORNA. The Commonwealth did not object to this request. As a result, this Court entered an Order vacating the sentence and remanding the case to the trial court. The trial court conducted a resentencing hearing, after which it imposed the same original sentence and ordered Coleman to register as a Tier 1 sex offender under subchapter H of SORNA. Coleman filed a post-sentence motion, which the trial court denied. Coleman timely appealed and filed a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Coleman raises the following questions for our review:

1. Did the [trial court] err by not suppressing evidence when the search warrant application lacked probable cause, did not show a nexus between the alleged crimes and [Coleman], was based upon omitted material information and stale information?

2. Did the [trial court] err by not finding the Commonwealth violated [Coleman's] Fifth Amendment rights by compelling [Coleman] to provide his phone password to law enforcement?

3. Did the [trial court] err by not dismissing the charges against [Coleman] when the Montgomery County District Attorney's Office failed to exercise due diligence throughout the instant case, thus violating Rule 600?

- 10 -

4. Did the [trial court] err by requiring [Coleman] to register as a sexual offender because the registration requirements of SORNA are unconstitutional both facially and as applied to [Coleman]?

Coleman's Brief at 8-9.

## Suppression of Evidence

Coleman's first two claims challenge the trial court's failure to suppress evidence found on his cell phone. Coleman first contends that evidence from his cell phone should have been suppressed because it was based on a legally insufficient search warrant. *Id.* at 17. Noting that a search warrant may only issue upon probable cause, and such probable cause exists if there is a substantial nexus between the search warrant application, a defendant, and the alleged crimes, Coleman argues that the unassigned IP address, an unreliable geolocation, and unconfirmed cell phone number did not establish probable cause. *Id.* at 18-19. Coleman asserts that the IP address is only a number and did not specifically identify a person or his home, and that the IP address was geolocated to Ambler, Pennsylvania, which is five miles from his home in Horsham. *Id.* at 19, 21, 22; *see also id.* at 19 (contending that "geolocation technology is not particularly reliable").

According to Coleman, the cyber tip included twelve different IP addresses, geolocated in Philadelphia and the surrounding area, that were used to access the MeWe account between October 8, 2019, and November 8, 2019, yet none of the IP addresses were used to access the account on the day the offending material was downloaded. *Id.* at 20. Coleman argues that

investigators searched only one of the twelve IP addresses, which was unassigned. *Id.* at 20. Coleman thus argues there is no nexus between the offending material and the cyber tip's IP address. *Id.*; *see also id.* at 20-21 (noting that determining ownership or authorship of internet-based accounts and communications are view with skepticism because they could be accessed by different people).

Coleman further asserts that there was no information in the search warrant indicating that MeWe users had to authenticate the cell phone number to sign up for the application, or that the account could be accessed on a desktop, laptop, or tablet. *Id.* at 21-22. He concludes, asserting that "the Commonwealth has not established enough probable cause within the four corners of the search warrant application to link [Coleman] to an unassigned IP address and an unverified social media account." *Id.* at 22.

We review the denial of a motion to suppress according to the following standard:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous.

*Commonwealth v. Fletcher*, 307 A.3d 742, 745-46 (Pa. Super. 2023) (citations and brackets omitted).

"Both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution protect individuals from unreasonable searches and seizures by police in areas where individuals have a reasonable expectation of privacy." *Commonwealth v. Boyd*, 296 A.3d 1270, 1274 (Pa. Super. 2023) (citation omitted). "If a person has a reasonable expectation of privacy in a place, then these constitutional provisions generally require police to obtain a warrant to search the place; a search warrant must be supported by probable cause and issued by a neutral, detached magistrate." *Id.* (citation omitted). "[A] cell phone often contains even more personal information than a home, and, therefore, it logically follows that a warrant should be required to search the contents of a cell phone, just as a warrant is required to search the contents of a home." *Commonwealth v. Young*, 287 A.3d 907, 920 (Pa. Super. 2022) (citation and quotation marks omitted).

"'Probable cause' is a practical, non-technical concept." *Boyd*, 296 A.3d at 1274 (citation omitted). "The issuance of a constitutionally valid search warrant requires that police provide the issuing authority with sufficient information to persuade a reasonable person that there is probable cause to conduct a search based upon information that is viewed in a commonsense manner." *Commonwealth v. Nicholson*, 262 A.3d 1276, 1280 (Pa. Super.

- 13 -

2021) (citation omitted). Probable cause must exist at the time the warrant is issued and must be based on the facts described within the four corners of the supporting affidavit. *Commonwealth v. Korn*, 139 A.3d 249, 253 (Pa. Super. 2016). "Probable cause is assessed by examining the totality of the circumstances and consists of deciding whether, given all the circumstances set forth in the affidavit[,] there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Young*, 287 A.3d at 920 (citations, ellipses, and quotation marks omitted). The totality of the circumstances may include an assessment of the veracity and basis of knowledge of an informant supplying information to police. *Commonwealth v. Wallace*, 42 A.3d 1040, 1048 (Pa. 2012).

"A court reviewing the issuing authority's determination of probable cause examines only whether a substantial basis exists for the issuing authority's finding of probable cause." *Commonwealth v. Pacheco*, 263 A.3d 626, 646 (Pa. 2021). The "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review, as an issuing authority's probable cause determination is entitled to deference." *Id.* (citation and quotation marks omitted). Further, "search warrants must be read in a [commonsense] fashion and should not be invalidated by hypertechnical interpretations." *Young*, 287 A.3d at 920 (citation and quotation marks omitted).

Here, the affidavit of probable cause sets forth the circumstances that prompted the affiant, Detective Reape, to seek to search Coleman's phone:

On November 21, 2019, I reviewed Cyber tip 59155622 sent by the [NCMEC]. The cyber tip was forwarded to my attention from the Delaware County ICAC Taskforce.

Cyber tip referral 59155622 contained two images that were uploaded to MeWe, by a user with the name of Johnny Cole. MeWe provided a cell phone for the account, 215-870-[****]. The images are of females estimated to be age 10-14 years old. The first image depicts the child standing naked with her vagina exposed to the camera. The second image is of the child lying on her back naked, vagina exposed with ejaculate on her vagina, stomach area.

MeWe reports the upload by the account holder to have occurred on September 17, 2019, at 20:08 UTC. An account login provided by MeWe dated October 31, 2019, at 22:24 UTC utilized IP Address 173.75.254.184. The IP Address geolocates to the Ambler, PA area. This IP address is assigned by Verizon Fios ….

An administrative Subpoena was sent to Verizon Fios requesting subscriber records for the IP Address as assigned October 31, 2019. On November 25, 2019, Verizon Fios responded to the subpoena that the IP address is under their control, yet records show it was not assigned on the requested date. Verizon was unable to provide any explanation.

On December 2, 2019[,] I conducted a search through the Montgomery County Police Report Management System for phone number 215-870-[****], the number assigned to the MeWe user account. Located in those records was a contact with a John Coleman, phone number, 215-870-[****].

On December 14, 2018[,] a medical assistance call was received by Springfield Township Police, Montgomery County, PA. The location of the call was Jamison Contractors, 150 Roesch Avenue, Oreland, PA. The injured party was a John Coleman, DOB 11/03/1983, with a provided address of [a specifically identified address in] Horsham Township. At that time John Coleman provided a cellular phone number of 215-870-[****].

A search of PennDot records shows a John Coleman, DOB 11/03/1983, of [an address located in] Feasterville, PA ….

On December 4, 2019, at 2:55 PM, I met with Jamison Home Services management. I was able to confirm that John Coleman is a current employee of Jamison Home Services and has provided them with a cellular phone number of 215-870-[****] for contact purposes. Jamison Home Services provided the address on file for John Coleman to be [the same specifically identified address in Horsham Township, Pennsylvania.] This address is within a few hundred yards of Ambler, [Pennsylvania] [m]ailing addresses and is consistent with the geolocation of the Verizon Fios IP Address.

A search of the National Insurance Crime Bureau[] located a previous vehicle claim by John Coleman extending back to May 8, 2009. In that claim[,] John Coleman listed his cellular phone number as 215-870-[****].

Based upon my knowledge, experience, and training in child exploitation and child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions with, there are certain characteristics common to individuals involved in the possession, receipt and distribution of child pornography:

a. They may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity;

b. They may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/ or drawings or other visual media. Oftentimes they use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate desired sexual acts;

c. They sometimes possess and maintain their copies of child pornographic material; that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence,

mailing lists, books, tape recordings, etc., in the privacy and security of their cellular phones for their ready access and to conceal from others. Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, images of child erotica, and video tapes for many years;

d. They prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

e. They may download child pornography and at a later time delete it with the knowledge that they can reacquire it again with the assistance of high[-]speed broadband internet. …

Based upon the conduct of individuals involved in the collection of child pornography set forth above, possessors tend to maintain their collections at a secure, private location for long periods of time. Based upon the fact that the user had possessed child pornography[,] there is probable cause to believe that evidence of the offenses of distributing, receiving and possessing child pornography is currently located on the cellular phone of John Coleman, assigned phone number 215-870-[****].

Additionally, forensic examiners can recover files even when they have been deleted. When the phone which stored the child pornography is seized, it is likely to contain evidence relating to the possession and possible distribution of child pornography even if the images have been deleted.

This affiant respectfully requests that this Court issue a search warrant for the cellular phone of John Coleman 215-870-[****], authorizing the search, seizure, and further forensic search at an offsite location of the cellular phone recovered.

Affidavit of Probable Cause, 12/5/2019, at 6-9.

We find no error in the trial court's conclusion that the totality of the circumstances provided probable cause to search Coleman's phone. Detective Reape's averments in the affidavit of probable cause included a cyber tip from

NCMEC, a nonprofit organization that works with law enforcement regarding child pornography issues; child pornography was uploaded to a MeWe account; the name on the account was Johnny Cole; an IP address used to access the account was in the area of Ambler, Pennsylvania, which is near Coleman's confirmed address; the phone number assigned to the account belonged to Coleman; Coleman's phone number was confirmed through numerous sources; a description of two images that would be found on the phone; and Detective Reape's statements, based upon his knowledge and experience, regarding the conduct of individuals and their use of cell phones in the collection of child pornography.

Coleman's focus on the single unassigned IP address and the imprecision of geolocation as establishing a lack of probable cause is misplaced. The IP address and geolocation was one small piece of Detective Reape's investigation and certainly not the basis for finding probable cause to search Coleman's phone. Instead, Detective Reape was able to tie Coleman and, more precisely, Coleman's cell phone, to the illegal images because the phone number linked to the MeWe account had been associated with Coleman for over a decade, which Detective Reape confirmed through various sources. Further, the MeWe username was merely a variation of his own name. And based upon Detective Reape's knowledge, training, and experience as an investigator of child exploitation and pornography, he knew that possessors of child pornography often have the images on their cell phones for quick

access and may repeatedly download and delete them, all of which can be recovered by police.[7]

As the affidavit of probable cause has established a sufficient nexus between Coleman and the phone number associated with the MeWe account, given the totality of the circumstances presented, there is fair probability that the evidence of the crime would be found on Coleman's cell phone. *See Commonwealth v. Thompson*, 985 A.2d 928, 931 (Pa. 2009) (Noting that the police are not required to prove their suspicion beyond a reasonable doubt, and "[t]he question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a probability, and not a

---

[7] Coleman further argues that the information used in the search warrant was stale because of the continuous change in IP addresses and the fact that "the offending materials were downloaded on September 17, 2019, while the IP addresses from the cyber tip accessed the account between October 8, 2019[,] and November 8, 2019." Coleman's Brief at 23. This claim was not raised in Coleman's Rule 1925(b) statement and is therefore waived. *See* Rule 1925(b) Statement, 5/9/2023, at 1 (unnumbered); Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the [s]tatement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived"). Even if not waived, it is meritless for the same reason—the IP address was not the basis for establishing probable cause. Furthermore, although the "[a]ge of the information supporting a warrant application is a factor," and information that is too old may be stale, potentially eliminating probable cause, staleness "is not determined by age alone." *Commonwealth v. Leed*, 186 A.3d 405, 413 (Pa. 2018) (citation omitted). Under these facts, the IP address evidence in question was not stale. *See, e.g., Commonwealth v. Gomolekoff*, 910 A.2d 710, 713-14 (Pa. Super. 2006) (rejecting a staleness claim where police obtained a warrant nine and a half months after the defendant sent emails containing alleged child pornography, noting that other courts had observed in other cases that "pedophiles rarely, if ever, dispose of child pornography" and that "individuals will protect and retain child pornography for long periods for time because it is illegal and difficult to obtain").

prima facie showing, of criminal activity.") (citation, quotation marks, and emphasis omitted). Therefore, the trial court did not err by denying Coleman's motion to suppress the evidence found on his cell phone.

In his second claim, Coleman argues that police violated his Fifth Amendment rights by requesting that he enter his password into his cell phone, and he complied. Coleman's Brief at 25-26. He alleges that this constituted a violation of *Commonwealth v. Davis*, 220 A.3d 534, 543 (Pa. 2019), in that the government compelled the "mental act of verbal communication, as a pathway to files being withheld." Coleman's Brief at 24. According to Coleman, his "phone password was impermissibly compelled because [he] was coerced to use the contents of his mind to communicate evidence against himself," and the password was self-incriminating since it directly led to the offending material. *Id.* As a result, Coleman contends that the "cell phone password is protected under the Fifth Amendment and any incriminating evidence from [his] cell phone should have been suppressed." *Id.*

The Fifth Amendment provides, "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. CONST., amend. V. "This privilege not only applies to a defendant in a criminal trial, but in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate [the speaker] in future criminal proceedings." *Davis*, 220 A.3d at 542 (citation and quotation marks omitted). "To invoke the Fifth Amendment

privilege against the forced provision of information, a defendant must show (1) the evidence is self-incriminating; (2) the evidence is compelled; and (3) the evidence is testimonial in nature." ***Id.*** at 543; ***see also Commonwealth v. Brown***, 26 A.3d 485, 497 (Pa. Super. 2011) ("the Fifth Amendment proscribes only self-incrimination obtained by a genuine compulsion of testimony") (citation omitted). "For Fifth Amendment purposes, compulsion exists when some factor denies the individual the free choice to admit, to deny, or to refuse to answer." ***Brown***, 26 A.3d at 497 (citation and quotation marks omitted). "Absent some officially coerced self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." ***Commonwealth v. Padillas***, 997 A.2d 356, 362 (Pa. Super. 2010) (citation omitted).

During the suppression hearing, Detective Reape testified that Detective Higgins, Sergeant Dunning, and he approached Coleman outside his apartment, and asked him whether he used the MeWe app. N.T., 9/14/2021, at 61. After Coleman indicated that he used the app for adult pornography, Detective Reape asked Coleman if they could look at his phone. ***Id.*** Coleman indicated that the phone was in his apartment and allowed the officers into the apartment. ***Id.*** at 61-62. The officers respectfully waited in the foyer so as not to disturb his sleeping girlfriend and dog. ***Id.*** at 62. Coleman opened his phone and showed adult pornography images to the officers. ***Id.*** At this point, Detective Reape indicated they had a search warrant for the phone, and

Coleman locked his phone. *Id.* Detective Reape asked Coleman "if he would mind opening the phone back up and he put in the code," and Coleman complied, entering his passcode into the phone. *Id.* at 62-63. Detective Reape stated he never told Coleman that he had to open the phone, emphasizing that the interaction between Coleman and police was "cordial." *Id.* at 63-64. Detective Reape further noted that although the easiest way to access the phone was with Coleman's password, the Montgomery County Detective Bureau had Gray Key technology that could grant them access to the phone, bypassing the passcode. *Id.* at 65.

Coleman confirmed Detective Reape's testimony. He stated that the detectives approached him and followed him into his apartment, waiting in the foyer so they would not disturb anyone. *Id.* at 178-179. They requested that he unlock his phone, advising him that they had a warrant and would get into the phone whether he provided them the passcode or not. *Id.* at 179-180. He agreed that no one yelled at him or raised their voice, no obscenities or threats were used, and he voluntarily entered the passcode. *Id.* at 177, 180.

The trial court found that Coleman did "not overcome the second prong of the three-prong test, as he was not compelled to provide the information." Trial Court Opinion, 10/26/2021, at 5. The trial court determined that police did not coerce Coleman into providing his passcode, but simply asked for it. *Id.* at 5, 6. The trial court further observed that because of the Gray Key

technology, police could access to the phone without the passcode. *Id.* at 5-6.

We agree with the trial court's conclusion that there was no evidence of compulsion—Detective Reape asked Coleman for his passcode and Coleman willingly entered it into the phone. *See id.* at 1-2 (Finding Detective Reape's testimony to be "straightforward and candid. As such, the [c]ourt credits that testimony in its entirety."); *see also Fletcher*, 307 A.3d at 745-46. Moreover, Coleman did not invoke his Fifth Amendment privilege prior to providing the passcode. *See Commonwealth v. Knoble*, 42 A.3d 976, 979 (Pa. 2012) (stating that "if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself").

Coleman's reliance on *Davis* is misplaced. Unlike here, in *Davis*, the second prong of the test—whether police compelled the disclosure of evidence—was uncontested and not at issue, and the Court was only required to consider whether providing a computer password is testimonial. *See Davis*, 220 A.3d at 543, 548.

Coleman failed to meet the second prong of the test to invoke the Fifth Amendment privilege against the forced provision of information. As the factual finding is supported by the record, the trial court properly denied suppression on these grounds. *See Brown*, 26 A.3d at 497; *Padillas*, 997 A.2d at 362. Coleman's second claim fails.

## Rule 600

Coleman's third claim implicates Rule 600 of the Pennsylvania Rules of Criminal Procedure, which provides that "[t]rial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed."  Pa.R.Crim.P. 600(A)(2)(a).  This is commonly referred to as the "mechanical run date." ***Commonwealth v. Harth***, 252 A.3d 600, 607, n.7 (Pa. 2021).  "The 'adjusted run date' is then calculated by adding any time that is excluded from the computation under Rule 600(C)(1)." ***Commonwealth v. Malone***, 294 A.3d 1247, 1249 (Pa. Super. 2023) (citation and quotation marks omitted).

"[P]eriods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence," while "[a]ny other periods of delay shall be excluded from the computation."  Pa.R.Crim.P. 600(C)(1);[8] ***see also*** Pa.R.Crim.P. 600, cmt. ("If the delay occurred as the result of circumstances beyond the Commonwealth's control and despite its due diligence, the time is excluded").  In other words, "Rule 600 establishes two requirements that must be met for delay to count

---

[8] The Pennsylvania General Assembly enacted a new Rule 600, effective as of July 1, 2013.  The general dictates of new rule remained the same, but the prior distinctions between excludable time and excusable delay were abandoned for streamlined review of Commonwealth's due diligence.  Notably, the failure to exercise due diligence constituted "includable time." ***Commonwealth v. Wiggins***, 248 A.3d 1285, 1289 (Pa. Super. 2021).

toward the 365-day deadline: (1) the delay must be caused by the Commonwealth; and (2) the Commonwealth must have failed to exercise due diligence." *Commonwealth v. Johnson*, 289 A.3d 959, 982 (Pa. 2023); *see also Harth*, 252 A.3d at 617 ("[T]he Commonwealth is required to demonstrate that it acted with due diligence during a time period before that period can be deemed excludable.") (emphasis and footnote omitted). "Otherwise, the delay is excluded from the calculation of the run date." *Johnson*, 289 A.3d at 982.

"Due diligence is fact specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." *Id.* (citation omitted). Due diligence must be demonstrated by a preponderance of the evidence. *Wiggins*, 248 A.3d at 1289. Rule 600 "expressly calls upon a trial court to assess the Commonwealth's due diligence throughout the life of a case, when faced with a claim that the Commonwealth violated a defendant's speedy trial rights." *Harth*, 252 A.3d at 617; *see also* Pa.R.Crim.P. 600(C)(1) (stating that "periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence").

A defendant who has not been brought to trial within the time specified in Rule 600(A) may, at any time prior to trial, "file a written motion requesting

that the charges be dismissed with prejudice on the ground that [the] rule has been violated." Pa.R.Crim.P. 600(D)(1). "If the trial court determines that the Commonwealth violated Rule 600, it shall dismiss the charges and discharge the defendant." **Harth**, 252 A.3d at 615.

With this background in mind, we turn to Coleman's argument. Coleman contends that the trial court abused its discretion in failing to dismiss the case pursuant to Rule 600 as the Commonwealth did not act with due diligence throughout the case.[9] Coleman's Brief at 26. Coleman notes that the criminal complaint was filed on December 6, 2019, resulting in a mechanical run date of December 7, 2020.[10] **Id.** at 30. Coleman acknowledges that he asked for a continuance of the preliminary hearing, which adds thirty-seven days to the run date, making the adjusted run date January 12, 2021. **Id.** Noting that the bench trial was scheduled for September 14, 2021, Coleman argues that the Commonwealth failed to exercise due diligence from the date of the

_____

[9] Although the bench trial did not occur until April 27, 2022, Coleman's Rule 600 argument is confined to the trial court's denial of his first Rule 600 motion, based upon the scheduled date of trial of September 14, 2021 and the Commonwealth's due diligence leading up to that date. We therefore confine our analysis to the dates and claims raised.

[10] Because 365 days from December 6, 2019 was a Saturday (December 5, 2020), the mechanical run date extended to the following Monday. **See** 1 Pa.C.S. § 1908 (stating that when the final day of a time period falls on a Saturday, Sunday, or legal holiday, the days are excluded from the computation).

preliminary hearing, January 12, 2020, through September 14, 2021—611 days. *Id.*

Coleman argues that during the Covid-19 pandemic, the Montgomery County Court of Common Pleas declared a judicial emergency until August 31, 2021, but only suspended Rule 600 from March 16, 2020, through May 31, 2020. *Id.* at 27. In support of his argument, Coleman relies upon ***Commonwealth v. Lear***, 290 A.3d 709, 720 (Pa. Super. 2023), ***appeal granted***, 305 A.3d 541 (Pa. 2023), wherein this Court found that because Montgomery County did not provide that Rule 600 would be suspended after May 31, 2020, the Commonwealth had a duty to establish it acted with due diligence in bringing the case to trial after this date for the judicial delay to be excluded from Rule 600 computations. Coleman's Brief at 27-28. Coleman asserts that the Commonwealth failed to exercise due diligence during the pandemic when Rule 600 was no longer suspended, observing that the trial judge provided notice that the Commonwealth could request access to the courthouse, if needed. *Id.* at 32.

As evidence of the Commonwealth's failure to exercise due diligence, Coleman points to the Commonwealth's failure to file the bills of information until the day before the scheduled trial, believing this demonstrates the failure to fulfill a basic requirement to have the case ready for trial. *Id.* at 30-31. He further highlights that the Commonwealth failed to provide ongoing discovery in a timely manner, noting he first asked for discovery on February

19, 2020, and it was not completed until August 11, 2021.  *Id.* at 30, 31-32, 33.  Coleman asserts that the change in district attorney working on his case was irrelevant and D'Aguanno had the responsibility to apprise herself of any ongoing discovery requests.  *Id.* at 32.

Our standard of review of a trial court's denial of a Rule 600 motion is as follows:

> In evaluating Rule 600 issues, our standard of review of a trial court's decision is whether the trial court abused its discretion.  Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration.  An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.
>
> The proper scope of review is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court.  An appellate court must view the facts in the light most favorable to the prevailing party.
>
> Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600.  Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society.  In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it.  However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.
>
> So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime.  In

considering these matters ... courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

*Commonwealth v. Faison*, 297 A.3d 810, 821 (Pa. Super. 2023) (citation, brackets, and emphasis omitted).

Here, as noted above, the mechanical run date—365 days from the date of the filing of the complaint—was December 7, 2020. Next, we must address the time periods in question to determine whether the Commonwealth caused the delay and failed to exercise due diligence to determine the adjusted run date. Coleman concedes that the delay between January 14, 2020, the date of the scheduled preliminary hearing, and February 19, 2020, the date of the rescheduled preliminary hearing, was caused by him due to the unavailability of his counsel; thus, thirty-seven days is excluded from the Rule 600 calculations, bringing the adjusted run date to January 11, 2021.

Next, as Coleman again concedes, our Supreme Court suspended the operation of Rule 600 from March 16, 2020 through May 31, 2020, because of the Covid-19 pandemic.[11] This seventy-six-day period is likewise excluded from Rule 600 calculations. *See Commonwealth v. Carl*, 276 A.3d 743, 751 (Pa. Super. 2022) (holding that an order suspending Rule 600 without

_____

[11] In *Lear*, this Court found that Montgomery County did not specifically suspend Rule 600 after May 31, 2020; therefore, for delay after May 31, 2020, the Commonwealth had to exercise due diligence to exclude the time from Rule 600 computations. *Id.* at 720. The *Lear* Court remanded the issue to the trial court to make this determination. *Id.*

qualification adds time to the run date without considering the Commonwealth's due diligence during this period). This brings the adjusted run date to March 29, 2021.

Next, we review the period between June 1, 2020, the end of the Rule 600 suspension in Montgomery County, and August 18, 2021, when the Commonwealth sought a continuance of the trial date originally scheduled for August 24, 2021. The record reflects that Coleman filed a motion for discovery on April 14, 2020, and Wevodau provided discovery on May 12, 2020. N.T., 4/26/2022, at 26, 78-79; **see also** Commonwealth Exhibit 1(email from Wevodau to Coleman on May 12, 2020, containing the discovery). Although Coleman's counsel responded the following day asking for police and expert reports, the record shows no further communications or filings concerning discovery occurred until July 2021, when D'Aguanno was assigned to this case. **Id.** at 29, 31-32; **see also id.** at 31-32 (wherein the trial court took judicial notice of office restrictions for district attorneys and going into courtrooms during the pandemic). On July 16, 2021, D'Aguanno emailed Coleman's counsel stating that her file indicated discovery had been sent in May 2020. **Id.** at 32-33, 35-37; **see also** Commonwealth Exhibit 2 (email from D'Aguanno to Coleman's counsel on July 16, 2021). She did not have access to Wevodau's email to know what, if anything, occurred discovery-wise between May 2020 and July 2021. **Id.** at 32. At that point Coleman asked for various reports and for witness contact information. **Id.** at 37; **see also**

Commonwealth Exhibit 3 (emails between D'Aguanno and Coleman's counsel). D'Aguanno informed Coleman that she could not provide certain reports because they included pornographic images of children, or witness addresses and phone numbers. *Id.* at 38-39. Thereafter, both before and after the trial court's discovery order on August 4, 2021, D'Aguanno provided discovery to Coleman's counsel, including contacting all the detectives who worked on the case and producing the expert reports. *Id.* at 44-49, 55-59, 84-85.

The trial court found that the Commonwealth exercised due diligence during this period:

> It is clear from the record that the Commonwealth exercised due diligence during the time at issue. The Covid-19 pandemic was unprecedented in its effect upon not only society at large but the judicial system in particular. The impacts of Covid-19 were far-reaching. It created uncertainty and, at times, confusion in the judicial system itself and in offices operating within the system such as the District Attorney's and Public Defender's offices which were functioning in large part remotely with reduced staffs within the courthouse. It was, to say the least, an uncertain time during which all of us were operating in uncharted waters.
>
> … The record in this case … evidences an overburdened assistant district attorney who assumed control of the case from a former assistant district attorney who had left the District Attorney's office in the midst of the Covid-19 pandemic. Upon being assigned the case, [D'Aguanno] shepherded it through the judicial emergency declaration with continued communication with the [trial c]ourt and defense counsel in a timely and responsive manner under all the circumstances in the extraordinary Covid-19 period. … [The trial c]ourt finds the Commonwealth has met its burden of exercising due diligence during the pendency of this case.

Trial Court Opinion, 8/23/2023, at 24-25.

Based upon the circumstances of the case (and, indeed, the world) during the complained-of period, as well as our scope and standard of review, we find no abuse of discretion in the trial court's conclusion that the Commonwealth exercised due diligence. After May 2020, when the Commonwealth provided Coleman much of the requested discovery, Coleman made no efforts or overtures concerning any outstanding discovery (perhaps because of the pandemic) until D'Aguanno was assigned to the case in July 2021. Notably, despite just being assigned to the case, D'Aguanno diligently responded to Coleman's requests for additional discovery and provided additional documents and information in a timely manner.

Coleman's attempts to gain access to items not subject to discovery, including witness contact information, which the Commonwealth did not provide to Colemen, does not establish the Commonwealth's lack of due diligence. *See* Pa.R.Crim.P. 573(B)(2) (the names and addresses of eyewitness are not mandatory discovery); *Commonwealth v. Rodriguez*, 174 A.3d 1130, 1144 (Pa. Super. 2017) (concluding "the Commonwealth was not required to disclose the addresses and other contact information of the witnesses"). Further, Coleman's counsel was permitted to view the photographs in question.

The Commonwealth was not required to demonstrate perfect vigilance and punctilious care, but simply put forth a reasonable effort. *See Johnson*, 289 A.3d at 982. Considering the pandemic, the appointment of a new

attorney for the Commonwealth in July 2021, D'Aguanno's initial belief that Wevodau had already provided all required discovery, and D'Aguanno presenting much of the outstanding discovery within a month of being assigned to the case, the Commonwealth demonstrated that it put forth a reasonable effort to bring the case to trial and was duly diligent. *Cf. Harth*, 252 A.3d at 621-22 (concluding that the Commonwealth's negligent failure to fulfill its discovery obligations, including requesting multiple continuances to provide discovery and providing discovery on the day of trial established the Commonwealth did not act with due diligence).

We likewise reject Coleman's argument that the Commonwealth's late filing of the bills of information evidenced a lack of due diligence. Coleman's Brief at 30-31.[12] It is well settled that a defendant must be fully apprised of the charges to avoid being prejudiced by "the last minute addition of alleged criminal acts of which the defendant is uninformed." *Commonwealth v. Jackson*, 215 A.3d 972, 979 (Pa. Super. 2019) (citation omitted). If the crimes specified in the original indictment involve the same basic elements and factual situation as the crimes specified in the information, "the defendant is deemed to have been placed on notice regarding his alleged criminal conduct." *Id.* (citation omitted). If the information alleges a different set of

---

[12] Coleman does not cite to any authority to support his claim that the late filing of the bills of information demonstrated a lack of due diligence by the Commonwealth. *See* Pa.R.A.P. 2119(a) (stating that argument must be supported by pertinent analysis and citation to authority).

events or the "defenses to the amended crime are materially different from the elements or defenses to the crime originally charged, … the defendant would be prejudiced by the change[.]" *Id.* (citation omitted).

The record reflects that, on December 6, 2019, the Commonwealth filed the criminal complaint, charging Coleman with ten counts of sexual abuse, nine graded as second-degree felonies and one graded as a third-degree felony, and one count of criminal use of a facility, arising out of the pornographic images found on his cell phone. The amended bills of information filed on September 13, 2021, charged Coleman with the same crimes, arising out of the same facts, but changed the grading of the sexual abuse of children counts to third-degree felonies. Coleman was placed on notice of the charges, and he does not raise any argument that he was prejudiced by the Commonwealth's late filing of the bills of information.[13] Therefore, we disagree that this constitutes evidence of the Commonwealth's failure to act with due diligence.

As the trial court's finding regarding the Commonwealth's exercise of due diligence is supported by the record, the 437-day period between June 1, 2020, the end of the Rule 600 suspension in Montgomery County, and August 12, 2021, the date of Commonwealth's request for a continuance of the

---

[13] Notably, Coleman's counsel raised no objection to the amended bills of information, which changed the grading of five counts of sexual abuse of children, during the stipulated trial. N.T., 4/27/2022, at 11.

scheduled trial, is excludable under Rule 600. This brings the adjusted run date June 10, 2022. As Coleman's stipulated trial occurred on April 27, 2022,[14] the case was brought to trial in a timely manner pursuant to Rule 600 and the trial court did not abuse its discretion in denying Coleman's Rule 600 motion to dismiss.

## **SORNA**

In his fourth claim, Coleman argues that his requirement to register under subchapter H of SORNA was unconstitutional. Coleman's Brief at 34-35. Coleman argues that SORNA's registration requirement violates his due process rights because it creates an irrebuttable presumption that all sexual offenders are likely to commit additional sexual offenses and constitutes a punishment. *Id.* at 35-40. Coleman also asserts that SORNA's registration requirements constitute cruel and unusual punishment. *Id.* at 40-41. Finally, Coleman challenges SORNA's constitutionality for violating the separation of powers doctrine by vesting authority over the registration process with the Pennsylvania State Police, and places sentencing determinations outside of the judiciary. *Id.* at 41-42.

Coleman's constitutional challenges raise "questions of law for which our standard of review is de novo and our scope of review is plenary."

---

[14] Ostensibly, the scheduling of trial in April 2022 was the result of the court's calendar. However, as Coleman raises no claims regarding this period and as his trial was held prior to the adjusted run date, we need not address it further.

*Commonwealth v. Torsilieri*, 232 A.3d 567, 575 (Pa. 2020) ("*Torsilieri I*")

(citation omitted).

> In addressing constitutional challenges to legislative enactments, we are ever cognizant that the General Assembly may enact laws which impinge on constitutional rights to protect the health, safety, and welfare of society, but also that any restriction is subject to judicial review to protect the constitutional rights of all citizens. We emphasize that a party challenging a statute must meet the high burden of demonstrating that the statute clearly, palpably, and plainly violates the Constitution.

*Id.* (citations omitted).

Coleman's claims are identical to those raised by the defendant in the *Torsilieri* line of cases. In 2018, the Chester County Court of Common Pleas found SORNA's subchapter H to be unconstitutional; the registration and notification provisions constituted punishment, thus violating the separation of powers doctrine; and subchapter H was cruel and unusual punishment. *Id.* at 574-75. In 2020, our Supreme Court vacated the trial court's determinations that SORNA subchapter H was unconstitutional and remanded for further evidentiary hearings regarding the alleged irrebuttable presumption and punitive nature of SORNA. *Id.* at 596. Upon remand, the trial court conducted hearings, after which it again concluded that SORNA subchapter H was unconstitutional in violation of the irrebuttable presumption doctrine and that subchapter H was punitive. *Commonwealth v. Torsilieri*, 316 A.3d 77, 84-85 (Pa. 2024) ("*Torsilieri II*"). The Commonwealth appealed and our Supreme Court reversed, finding that SORNA subchapter H did not violate the irrebuttable presumption doctrine, *see id.* at 91-100, and

that subchapter H was not punitive. *Id.* at 109-10. The Court further concluded that

> because a finding that [s]ubchapter H constitutes criminal punishment is a threshold factor in determining the viability of [the] derivative constitutional challenges — that the legislation unconstitutionally usurps judicial power over sentencing in violation of the separation of powers doctrine, constitutes cruel and unusual punishment under the Eighth Amendment, and infringes upon the right to a trial by jury by failing to require that facts which increase the punishment imposed for the underlying crime be found by a reasonable doubt — these constitutional claims fail.

*Id.* at 110.

Our Supreme Court's decision in *Torsilieri II* is conclusive as to the issues raised by Coleman. Accordingly, Coleman's final claim is without merit.

Judgment of sentence affirmed.

Judge Colins did not participate in the consideration or decision of this case.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 8/19/2024